PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 08-3275 & 08-3688

UNITED STATES OF AMERICA

v.

MICHAEL BANKOFF,

Appellant / Cross-Appellee

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 2-07-cr-00185-001)
District Judge: Honorable Michael M. Baylson

Argued June 3, 2010

Before: AMBRO, CHAGARES, and
VAN ANTWERPEN, Circuit Judges

Opinion filed: July 27, 2010

Thomas A. Dreyer, Esquire (Argued)
6 Dickinson Drive
Building 100, Suite 106
Chadds Ford, PA 19317

      Counsel for Appellant (Cross-Appellee)

Michael L. Levy
  United States Attorney
Robert A. Zauzmer
  Assistant United States Attorney
  Chief of Appeals
Bernadette A. McKeon (Argued)
  Assistant United States Attorney
Jason Bologna, Esquire
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

      Counsel for Appellee (Cross-Appellant)

---

## OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

      Section 115 of Title 18 of the United States Code makes it a crime to "threaten[] to assault, kidnap, or murder . . . an

official whose killing would be a crime under" § 1114 of that Title. 18 U.S.C. § 115(a)(1)(B). Section 1114, in turn, makes it a crime to kill "any officer or employee of the United States or of any agency in any branch of the United States Government." 18 U.S.C. § 1114. This case requires us to determine whether § 115 incorporates by reference all individuals covered by § 1114—including any "employee of . . . any agency in any branch of the" federal government—or instead, by using the term "official," incorporates only some limited subset of those individuals.

In March 2008, Michael Bankoff was convicted of threatening two employees of the Social Security Administration ("SSA") in violation of § 115, as charged in Counts Two and Three of the Indictment. The District Court granted a judgment of acquittal on Count Three, concluding that the employee in question—an SSA "claims representative"—did not qualify as an "official" because she performed only "routine and subordinate functions." The Court denied Bankoff's motion for a judgment of acquittal on Count Two, concluding that the employee in question—an SSA "operations supervisor"—qualified as an "official" because she supervised persons who "had the authority to adjudicate claims on behalf of the federal government."

Though Bankoff is not the first defendant successfully

3

prosecuted under § 115 for threatening a federal "employee,"[1] we are the first federal appellate court faced with the statutory interpretation issue presented here. We hold that § 115 incorporates by reference all persons covered by § 1114, and, accordingly, that § 115 applies to threats against federal "employee[s]" "whose killing would be a crime under" § 1114. Because § 115 applies to both of the employees Bankoff threatened, we affirm the District Court's denial of a judgment of acquittal on Count Two, vacate its grant of a judgment of acquittal on Count Three, and remand for further proceedings.

## I.    Background

### A.    The Offense Conduct

In 1999, Bankoff began receiving Social Security disability benefits. In a series of letters sent to Bankoff from December 2001 through May 2005, the SSA informed him that it had overpaid $9,000 in benefits to him and that he was required to repay that amount.

SSA claims adjuster Daniel Sphabmixy was assigned to

---

[1] *See, e.g.*, *United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009) (affirming conviction under § 115 for threatening "FBI agents and support staff," including a secretary, at a local FBI office); *United States v. Cash*, 394 F.3d 560, 561 (7th Cir. 2005) (affirming conviction under § 115 for threatening a "[s]ervice [r]epresentative" at a local Veterans Affairs office).

Bankoff's case in late 2006. Bankoff called Sphabmixy several times to dispute the overpayment. After reviewing Bankoff's file, Sphabmixy determined that Bankoff (1) was responsible for the error, and (2) had failed to provide sufficient information regarding his inability to repay the amount overpaid to him. Accordingly, Sphabmixy denied Bankoff's request to waive repayment.

On February 26, 2007, Bankoff called Sphabmixy to complain about the denial of the waiver. Bankoff was loud and profane, and told Sphabmixy that he was going to come to the office and "kick the shit out of him." Bankoff also left two voicemails for Sphabmixy that were threatening in nature.

Sphabmixy alerted his "operations supervisor"—Susan Tonik—and security personnel about Bankoff's threats. Tonik, in turn, notified the Federal Protective Service. Bankoff called Tonik later in the day on February 26 to apologize for his phone call to Sphabmixy, but again contested the overpayment issue.

Bankoff scheduled a meeting for March 9, 2007 with an SSA claims representative regarding the overpayment issue. However, Bankoff called Tonik the morning of March 9 and cancelled the meeting. He told Tonik that he wanted everything resolved over the phone, and again was angry, loud, profane, and, according to Tonik, "out of control." Tonik told Bankoff that she was unable to schedule a telephone conference with the assigned claims representative that day.

Following this conversation, Bankoff left a voicemail on Tonik's telephone, in which he shouted:

> [S]omebody ought to spit in that bitch's face, she doesn't know how to talk to people. She thinks I'm a child, I'm a grown up . . . . I will smack the shit out of that bitch. I'll take the little misdemeanor charge. What are they gonna do, fine me?

Tonik became "very worried and very scared" after listening to this message, and feared Bankoff's "threat was real."

Bankoff also spoke with SSA claims representative Crystal Robinson several times on March 9. In one of these conversations, Bankoff complained about Tonik and told Robinson that he would come to the office, take the gun away from "the pig up front," and "slap every woman in the place."

B.     Bankoff's Motion to Dismiss the Indictment

In April 2007, a federal grand jury returned a three-count indictment charging Bankoff with threatening employees of the SSA, in violation of 18 U.S.C. § 115. Section 115 provides in pertinent part:

> Whoever . . . threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, *or an*

6

*official whose killing would be a crime under [18 U.S.C. § 1114]*, with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished as provided in subsection (b).

18 U.S.C. § 115(a)(1) (emphasis added).

Bankoff moved to dismiss the indictment on the ground that his alleged victims—Sphabmixy, Tonik, and Robinson—did not qualify as "official[s] whose killing would be a crime under" § 1114. 18 U.S.C. § 115. Relying on *United States v. Fenton*, 10 F. Supp. 2d 501 (W.D. Pa. 1998)—the single reported decision by a federal court that addresses the meaning of the term "official" in § 115—Bankoff argued that § 115 does not incorporate all persons protected by § 1114, but only "officer[s]." *See id.* at 503 n.2 (reasoning that the terms "official" and "officer" are "closely related and . . . can only be construed to have the same meaning").[2] Accordingly, Bankoff

_____

[2] The defendant in *Fenton* was charged under § 115 with threatening a legislative aide to the late Representative John P. Murtha of Pennsylvania. The District Court granted Fenton's motion to dismiss the indictment, concluding that Representative Murtha's legislative aide could not be considered

7

argued that § 115 does not apply to threats made against "employees" like Sphabmixy, Tonik, and Robinson.

The District Court disagreed, concluding that "the plain language" of §§ 115 and 1114, "taken as a whole, indicates that 'official' encompasses [an] 'officer or employee.'" It stated, however, that its conclusion regarding the definition of "official" was only preliminary, and it invited Bankoff to raise the issue again at trial. The Court thus denied Bankoff's motion.

C.      The District Court's Jury Instructions

Near the end of trial, and despite its preliminary conclusion that § 115 applies to any "officer or employee" covered by § 1114, the District Court proposed to instruct the jury that, in addition to finding beyond a reasonable doubt that Sphabmixy, Tonik, and Robinson were "officer[s]" or "employees" whose killing would be a crime under § 1114, it must also find that they were "federal officials." The Court proposed to define "official" as a person

> authorized to exercise governmental functions and to make decisions on behalf of the Government. An official is a person who is authorized to

---

an "official" or an "officer" because he "undertakes to do only that which the Congressman directs, and does not exercise independent authority or discretion in administering the legislative power of the government." *Id.* at 507.

exercise his or her discretion in the performance of his or her governmental duties, *as distinguished from an employee* who performs routine and subordinate functions.

The Government objected, arguing that the proposed instruction was inconsistent with the Court's conclusion (in denying Bankoff's motion to dismiss the indictment) that the term "official" in § 115 encompasses any "officer or employee" whose killing would be a crime under § 1114. The Government (presciently) expressed concern that, following the conclusion of trial, Bankoff would attempt to argue that the Government had failed to prove that any of Bankoff's three victims were "officials" under the Court's proposed definition and seek a judgment of acquittal on that basis.

The District Court recognized that it had modified its preliminary ruling. It nonetheless explained that it had

a slight problem with the Government's expansive viewpoint. Because if you say that the word official in [§] 115 by reference to officer or employee in [§] 1114 . . . incorporates by reference every employee, no matter how lowly they may be, I think that's a leap.

The Court gave one example to explain its concern: a janitor employed by a federal agency, a person whom the Court doubted would qualify "in [] lay term[s] as [an] official."

9

After both sides rested at trial, the District Court gave the instruction it had proposed (including its definition of an "official"). The jury found Bankoff guilty of threatening Tonik and Robinson (Counts Two and Three), but acquitted him of threatening Sphabmixy (Count One).

### D.     Bankoff's Motion for a Judgment of Acquittal

Following the verdict, Bankoff moved for a judgment of acquittal on the Counts charging him with threatening Tonik and Robinson, arguing that the trial evidence was insufficient to prove that they were "officials" within the meaning of § 115. *See* Fed. R. Crim. P. 29(c). The District Court denied the motion as to Tonik, reasoning that she was an "operations supervisor" who "oversaw the daily operation of the supplemental security income program in the local field office" and "supervised 'claims representatives' who had the authority to adjudicate claims on behalf of the federal government." As such, the Court determined there was sufficient evidence that Tonik "made decisions on behalf of the government and therefore was a federal official."

The District Court granted the motion as to Robinson because her "testimony as to her job duties d[id] not indicate that she made decisions on behalf of the government." Robinson "did not have the authority to hire or supervise other employees," and her "usual job duties" included "answering the telephones." The Court thus concluded that Robinson was not an "official" and, in light of that conclusion, declined to reach

10

Bankoff's other two arguments—that the evidence was insufficient to prove that he (1) made a "true threat" against Robinson, or (2) acted with the specific intent of interfering with or retaliating against Robinson for performing her "official duties."

E.      Bankoff's Requests to Proceed *Pro Se*

On several occasions prior to trial, Bankoff told the District Court that he wished to represent himself during trial. He reiterated this request during a final pretrial hearing in March 2008. The Court conducted an extensive colloquy with Bankoff (in accordance with our precedent, *see United States v. Peppers*, 302 F.3d 120 (3d Cir. 2002)), advised him of the risks of representing himself, and strongly advised him against doing so. It also advised Bankoff that his counsel would remain as standby counsel (and would be available to take over the trial if Bankoff changed his mind), but stressed that he would not be allowed to switch back and forth with counsel during trial. At the end of this colloquy, the Court granted Bankoff's request to proceed *pro se*.

Before the final pretrial conference concluded, Bankoff changed his mind. During a conversation regarding jury instructions, the District Court again suggested that it was a bad idea for Bankoff to represent himself:

> [The Court]: I don't think that, with the limited
> education that you have of a GED—but you're a

11

bright fellow, you know, and I—I want to state that on the record. You have a good vocabulary. You're articulate. You understand my questions. And, however bright you are, you're just—I just don't think you're prepared to defend yourself as well as your lawyers can.

[Bankoff]: I think you're right, Your Honor.

[The Court]: All right.

[Bankoff]: I think I—I changed my mind. I think I—I think I—

[The Court]: Well, you don't have to make a decision today. You ought to sleep on this and talk to your lawyer some more.

[Bankoff]: Well, I spoke to them, and I was thinking about it for—for a while, and I—I think—I think that they're—they're—[my attorney] Ms. Rimmer did very well today. I think she did real good. [My other attorney,] Mr. McHugh, sometimes, he did good; sometimes, there was a couple of things that—I think I'll—I'll stick with my team, Your Honor.

I changed my mind, and I'm sorry to trouble the Court with these, you know, ups and

12

downs—

[The Court]: All right.

[Bankoff]: —fluctuations, whatever—

Despite Bankoff's statements that he no longer wished to proceed *pro se*, the Court informed him that if he "want[ed] to represent [himself] next Monday [the first day of trial], [it would] let [him] do it, but . . . it's a very bad idea."

Trial began the following Monday, and neither Bankoff nor his counsel raised the issue of self-representation prior to jury selection or opening statements. However, Bankoff repeatedly interrupted the prosecutor's opening statement with argumentative objections, and, after the prosecutor concluded, Bankoff demanded to give the opening statement for the defense. The Court informed Bankoff that it would not permit him to represent himself that day, but would address his objections at the end of the day (after the jury had been released). One witness for the Government (Sphabmixy) testified that day, and Bankoff's counsel conducted the cross-examination.

After the jury was dismissed, the District Court held an on-the-record conference with the parties. Bankoff denied he had ever withdrawn his request to proceed *pro se*, and complained that he had not been permitted to cross-examine Sphabmixy. The Court again advised Bankoff that he could not

13

"have it both ways," and asked him if he wanted to represent himself for the rest of trial. Bankoff declared that it was "too late," and that he was "just gonna have to let [his attorney] go forward from now."

But on Tuesday morning Bankoff again demanded to proceed *pro se*. The District Court ruled that his counsel would finish the cross-examination of Sphabmixy. Once cross was completed, however, the Court permitted Bankoff to represent himself. He cross-examined the Government's remaining witnesses (Tonik, Robinson, and Federal Protective Services Special Agent Jesse Kunkle), and the Court also allowed Bankoff to cross-examine Sphabmixy after the Government rested.

Bankoff chose to present a defense, calling his father and a psychiatrist to testify on his behalf. Bankoff's father was unable to answer some of his son's questions after becoming emotional, and the District Court—with Bankoff's consent—permitted standby counsel to finish the direct examination.

At the close of trial, Bankoff's counsel gave the closing statement for the defense after Bankoff was removed from the courtroom following an angry, profane, and lengthy outburst (which occurred outside of the jury's presence). The District Court informed the jury that Bankoff had "elected by his words and conduct to not be present" for the conclusion of summations. The Court nonetheless took care to instruct the

14

jury that it was "not to use" Bankoff's "words or his conduct during the trial" "for any purpose in [its] deliberations."

As noted, Bankoff was convicted on two of the three counts and the District Court overturned one of them, leaving only the conviction for threatening Tonik (Count Two). The Court then sentenced Bankoff to 60 months' imprisonment, which represented a nine-month upward variance from the advisory Guidelines range of 41-51 months. This timely appeal followed.[3]

## II.    Discussion

Bankoff argues that the District Court erroneously denied his motion for a judgment of acquittal on the Count charging him with threatening Tonik (Count Two); the Government cross-appeals the Court's grant of a judgment of acquittal on the Count charging Bankoff with threatening Robinson (Count Three). In addition, Bankoff contends that the Court deprived him of his right of self-representation in violation of the Sixth Amendment.[4]

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction over Bankoff's appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and over the Government's cross-appeal under 18 U.S.C. § 3731.

[4] Bankoff also challenges the reasonableness of the District Court's sentence. In light of our disposition of the

15

We conclude that the District Court erred in granting a judgment of acquittal as to Robinson, and thus vacate the Court's judgment on that Count. We affirm the Court's denial of a judgment of acquittal as to Tonik, but on a different ground. Finally, we reject Bankoff's Sixth Amendment claim.

### A.     Bankoff's Motion for a Judgment of Acquittal

To determine whether the District Court erred in its rulings on Bankoff's motion for a judgment of acquittal, we first interpret § 115. We have plenary review over a district court's interpretation of a statute, *United States v. Introcaso*, 506 F.3d 260, 264 n.3 (3d Cir. 2007), as well as its grant or denial of a judgment of acquittal based on sufficiency of the evidence, *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009).

### 1.     The Text of § 115

"Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language." *United States v. Albertini*, 472 U.S. 675, 680 (1985) . However, "the meaning of statutory language, plain or not, depends on context," *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991), and thus "is determined by reference to the language itself, the specific context in which that language is used, and the broader

---

Government's cross-appeal (wherein we vacate the Court's grant of a judgment of acquittal as to Count Three), we need not address that claim.

context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see also Beecham v. United States*, 511 U.S. 368, 372 (1994) ("The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences."); *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) ("When interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . ." (internal quotation marks and citation omitted)). In that light, though we "presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use," *United States v. Knox*, 32 F.3d 733, 744 (3d Cir. 1994), "[t]he circumstances of . . . particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect," *Watt v. Alaska*, 451 U.S. 259, 266 (1981).

Bankoff's argument in support of his interpretation of § 115 is straightforward. He contends that, because the terms "official" and "employee" have different ordinary meanings, Congress could not have intended that § 115 apply to threats against employees "whose killing would be a crime under" § 1114 by referring to threats against "official[s] whose killing would be a crime under" § 1114. 18 U.S.C. § 115(a)(1)(B). *See also Webster's Third New Int'l Dictionary* 743 (1971) ("employee" means "one employed by another[,] usu[ally] in a position below the executive level and usu[ally] for wages"); *id.* at 1566 ("official" means "a person authorized to act for a government, corporation, [or] organization"). Though Bankoff's argument is not without surface appeal, we reject it.

17

Section 115 prohibits threats against four categories of individuals—"United States official[s]," "United States judge[s]," "Federal law enforcement officer[s]," and "official[s] whose killing would be a crime under" § 1114—but includes specific definitions for only the first three. "United States official"—a term that would encompass a wide class of persons if construed consistent with its ordinary meaning—is defined narrowly to include only "the President, President-elect, Vice President, Vice President-elect, a Member of Congress, a member-elect of Congress, a member of the executive branch who is the head of a department listed in 5 U.S.C. § 101, or the Director of the Central Intelligence Agency." 18 U.S.C. § 115(c)(4). By contrast, a "Federal law enforcement officer" is defined more broadly than its ordinary meaning to include "any officer, agent, or employee of the United States authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of Federal criminal law."[5] *Id.* § 115(c)(1).

In this context, it appears to us that Congress intended terms like "official" and "officer" to have a special meaning in § 115 that was not the same as their ordinary, dictionary definitions. As noted, § 115 itself defines a federal law enforcement "*officer*"—a term Bankoff contends is synonymous

---

[5] To complete the definitional trilogy, a "United States judge" is "any judicial officer of the United States, and includes a justice of the Supreme Court and a United States magistrate judge." *Id.* § 115(c)(3).

18

with "official" for purposes of the cross-reference to § 1114—as including federal "*employee[s]* . . . authorized to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of Federal criminal law." *Id*. (emphasis added).

Nor is § 115 unusual in this regard; indeed, other sections of the Criminal Code specifically define the term "official" to include "employees." For example, the federal bribery statute defines "public official" to include a

> Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer *or employee* or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror.

18 U.S.C. § 201(a)(1) (emphasis added). Similarly, the statute prohibiting the murder or manslaughter of foreign officials defines a "foreign official" to include

> any person of a foreign nationality who is duly notified to the United States as an officer *or employee* of a foreign government or international organization, and who is in the United States on official business, and any member of his family

19

> whose presence in the United States is in
> connection with the presence of such officer or
> employee.

18 U.S.C. § 1116(b)(3)(B) (emphasis added).

Finally, we believe it especially significant that § 115 defines the first three categories of covered persons but provides no definition for the fourth category. This strongly suggests that Congress intended for § 1114 itself to define that category by incorporating it by reference into § 115. *Cf. Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) (when a statute defines a term, a court "must follow that definition, even if it varies from that term's ordinary meaning").

Notwithstanding this statutory context, Bankoff asks us to compare § 115 with § 111 of Title 18, which makes it a crime to "forcibly assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with *any person designated* in section 1114 of this title while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a)(1) (emphasis added). Bankoff argues that, "[h]ad Congress intended [§] 115 to cover the exact same class of victims as [§] 1114, it would have employed the exact same language which it used in" § 111—*i.e.*, § 115 would refer to any "*person* designated" in § 1114 instead

20

of an "*official* whose killing would be a crime" under § 1114.[6] (Appellant's Reply Br. at 5.)

We are not persuaded. The different language used to incorporate § 1114 is readily explained by § 111's unique statutory history. Both § 111 and § 1114 originate from a 1934 Act "[t]o provide punishment for killing or assaulting [f]ederal officers." Pub. L. No. 73-230, 48 Stat. 780 (1934). Section 1114 stems from § 1 of the 1934 Act; § 111 flows from § 2, which "forbade forcible resistance or interference with, or assault upon," "any person designated in section 1 hereof." 48 Stat. 780, 781; *see United States v. Feola*, 420 U.S. 671, 679 (1975). Section 111 assumed its current form in 1948 when it was re-codified as a separate section of Title 18, 62 Stat. 688 (1948); *see Feola*, 420 U.S. at 678 n.13, and in re-codifying that section it appears that Congress simply retained the original language used in the 1934 Act (*i.e.*, a "person designated").

In any event, that Congress used different language to incorporate § 1114 in different statutes that were codified nearly four decades apart—§ 111 in 1948, and § 115 in 1984, Pub. L.

---

[6] We note that at least one other section of Title 18 incorporates § 1114 using language similar to § 115. *See* 18 U.S.C. § 876(c) (providing for a ten-year statutory maximum term of imprisonment where a defendant mails a threatening communication to "a United States judge, a Federal law enforcement officer, or an *official who is covered by section 1114*" (emphasis added)).

21

No. 98-473, 98 Stat. 2140 (1984)—does not, standing alone, demonstrate that it used the term "official" (as opposed to "person") in § 115 with the intention of limiting its scope.[7] And though Congress could have used a term other than "official" to achieve the same result, its choice makes sense when § 115 is viewed in context, given both its title ("[i]nfluencing, impeding, or retaliating against a Federal *official* by threatening or injuring a family member") and the kinds of threats to which it applies (*e.g.*, those made to retaliate against such an official "on account of the performance of *official duties*").  18 U.S.C. § 115 (emphases added).

---

[7] Though not raised by the parties, we note that another section of Title 18, § 119, contains incorporating language similar to § 111.  *See* 18 U.S.C. § 119(a), (b)(2)(A) (making it a crime in certain circumstances to "make[] restricted personal information about a covered person . . . publicly available," and defining a "covered person" to include "an *individual designated* in section 1114" of Title 18 (emphasis added)).  Section 119 was enacted in 2008, Pub. L. No. 110-177, 121 Stat. 2536 (2008), more than two decades after § 115 was enacted in 1984.  In any event, there is no indication from either the text or legislative history of § 119 that its reference to an "individual designated" in § 1114 was chosen to distinguish its scope from that of § 115.

2.      The Text of § 1114

This interpretation of § 115 is confirmed by an examination of the version of § 1114 that was in force when § 115 was enacted in 1984. As noted, § 1114 originates from § 1 of the 1934 Act, and, in its original form, made it a crime to kill seven types of "federal officers" while they were "engaged in the performance of [their] official duties, or on account of the performance of [their] official duties."[8] That section was separately codified as 18 U.S.C. § 1114 in 1948, 62 Stat. 756 (1948), and in the decades that followed Congress "greatly expanded" the categories of persons protected by that provision. *Feola*, 420 U.S. at 679 n.15. By 1984 (when § 115 was enacted), § 1114 applied to any "officer or employee" of, among many federal agencies and departments, the Secret Service, the Drug Enforcement Administration, the Veterans' Administration (now the Department of Veterans Affairs), the Department of Agriculture, the Federal Depository Insurance Corporation, the Federal Communications Commission, and the National

---

[8] These "federal officers" were: "any United States marshal or deputy United States marshal, special agent of the Division of Investigation of the Department of Justice, post-office inspector, Secret Service operative, any officer or enlisted man of the Coast Guard, any employee of any United States penal or correctional institution, any officer of the customs or of the internal revenue, [or] any immigrant inspector of any immigration patrol inspector." 48 Stat. 780.

23

Aeronautics and Space Administration.[9]   And in addition to

---

[9] In full, the version of 18 U.S.C. § 1114 in force when § 115 was enacted provided as follows:

> Whoever kills or attempts to kill any judge of the United States, any United States Attorney, any Assistant United States Attorney, or any United States marshal or deputy marshal or person employed to assist such marshal or deputy marshal, any officer or employee of the Federal Bureau of Investigation of the Department of Justice, any officer or employee of the Postal Service, any officer or employee of the [S]ecret [S]ervice or of the Drug Enforcement Administration, any officer or member of the United States Capitol Police, any member of the Coast Guard, any employee of the Coast Guard assigned to perform investigative, inspection or law enforcement functions, any officer or employee of any United States penal or correctional institution, any officer, employee or agent of the customs or of the internal revenue or any person assisting him in the execution of his duties, any immigration officer, any officer or employee of the Department of Agriculture or of the Department of the Interior designated by the Secretary of the Interior to enforce any Act of Congress for the protection, preservation, or restoration of game and other wild birds and animals, any employee of the Department of

24

Agriculture designated by the Secretary of Agriculture to carry out any law or regulation, or to perform any function in connection with any Federal or State program or any program of Puerto Rico, Guam, the Virgin Islands of the United States, or the District of Columbia, for the control or eradication or prevention of the introduction or dissemination of animal diseases, any officer or employee of the National Park Service, any civilian official or employee of the Army Corps of Engineers assigned to perform investigations, inspections, law or regulatory enforcement functions, or field-level real estate functions, any officer or employee of, or assigned to duty in, the field service of the Bureau of Land Management, or any officer or employee of the Indian field service of the United States, or any officer or employee of the National Aeronautics and Space Administration directed to guard and protect property of the United States under the administration and control of the National Aeronautics and Space Administration, any security officer of the Department of State or the Foreign Service, or any officer or employee of the Department of Health, Education, and Welfare, the Consumer Product Safety Commission, Interstate Commerce Commission, the Department of Commerce, or the Department of Labor or of the Department of the Interior or of the Department of Agriculture assigned to

25

perform investigative, inspection, or law enforcement functions, or any officer or employee of the Federal Communications Commission performing investigative, inspection, or law enforcement functions, or any officer or employee of the Veterans' Administration assigned to perform investigative or law enforcement functions, or any United States probation or pretrial services officer, or any United States magistrate, or any officer or employee of any department or agency within the Intelligence Community (as defined in Section 3.4(F) of Executive Order 12333, December 8, 1981, or successor orders) not already covered under the terms of this section,[] any attorney, liquidator, examiner, claim agent, or other employee of the Federal Depository Insurance Corporation, the Federal Savings and Loan Insurance Corporation, the Comptroller of the Currency, the Federal Home Loan Bank Board, the Board of Governors of the Federal Reserve System, any Federal Reserve bank, or the National Credit Union Administration, or any other officer, agency, or employee of the United States designated for coverage under this section in regulations issued by the Attorney General engaged in or on account of the performance of his official duties, or any officer or employee of the United States or any agency thereof designated to collect or compromise a Federal claim in accordance with

"officer[s] or employee[s]" of such agencies and departments, § 1114 also covered, among others, any "*agent* of the customs or of the internal revenue," any "*member* of the United States Capitol Police," and any "*member* of the Coast Guard."[10]  18 U.S.C. § 1114 (1984) (emphasis added).  Congress did not shorten this list until 1996—twelve years after it enacted

> sections 3711 and 3716–3718 of title 31 or other statutory authority[,] shall be punished as provided under sections 1111 and 1112 of this title, except that any such person who is found guilty of attempted murder shall be imprisoned for not more than twenty years.

18 U.S.C. § 1114 (1984).

[10] In addition to these "officers," "employees," "members," and "agents," the 1984 version of § 1114 also applied to "any civilian *official . . .* of the Army Corps of Engineers." 18 U.S.C. § 1114 (1984) (emphasis added).  In that light, accepting Bankoff's argument that § 115 does not incorporate fully the persons listed in § 1114 would lead to an absurd result.  Because we presume that Congress was aware of the language of § 1114 when it enacted § 115, *see, e.g.*, *United States v. Mohammed*, 27 F.3d 815, 821 (2d Cir. 1994)—and thus presume that Congress knew that § 1114 referred to only *one* type of "official"—it would follow that § 115's prohibition of threats against an "*official* whose killing would be a crime under" § 1114 was limited to threats against "civilian official[s] . . . of the Army Corps of Engineers."  That could not have been Congress' intent.

27

§ 115—when it amended § 1114 to refer simply to "any officer or employee of the United States or of any agency in any branch of the United States Government." 18 U.S.C. § 1114 (1996). (One suspects that the queue of requests for additional inclusions had grown too long.)

This statutory context confirms our conclusion that Congress used "official" in § 115 as a general term to incorporate by reference all the "officers," "employees," "members," and "agents" of the federal departments and agencies listed in § 1114. By doing so, Congress avoided the need to restate that lengthy list in § 115 itself. *See, e.g.*, *Hassett v. Welch*, 303 U.S. 303, 314 (1938) ("Where one statute adopts the particular provisions of another by a specific and descriptive reference . . . , the effect is the same as though the statute or provisions adopted had been incorporated bodily into the adopting statute." (internal quotation marks and citation omitted)); *see also* Norman J. Singer & J.D. Shambie Singer, 2B *Sutherland Statutes and Statutory Construction* § 51:8 ("When [a] reference is made to a specific section of [a] statute, that part of the statute is applied as though written into the reference statute."). Moreover, we think it implausible that Congress used the term "official" as a limitation on the persons enumerated in § 1114, yet declined to define that term or provide any indication as to how courts (or, presumably, juries) were to determine which of the enumerated "employees," "officers," "members," and "agents" listed in § 1114 also qualify as

28

"officials."[11]

In sum, we conclude that when § 115's reference to an "official whose killing would be a crime under" § 1114 is read in context, its meaning is plain; "official" is not used as a term

---

[11] Though employees of the SSA were not included among the federal employees listed in the 1984 version of § 1114, that version of the statute authorized the Attorney General to designate "any other officer or employee of the United States or any agency thereof . . . for coverage under" § 1114. 18 U.S.C. § 1114 (1984). And before the 1996 amendment to § 1114, the Attorney General had designated "[e]mployees of the Social Security Administration assigned to Administration field offices, hearing offices and field assessment offices" as employees covered under § 1114. 28 C.F.R. § 64.2(x) (1992). Accordingly, we need not determine in this case whether Congress intended for § 115 to incorporate the 1996 amendment to § 1114, as employees of the SSA were covered even under the prior version of that statute. *See* Norman J. Singer & J.D. Shambie Singer, 2B *Sutherland Statutes and Statutory Construction* § 51:8 (noting the general rule that "[a] statute of specific reference incorporates the provisions referred to from the statute as of the time of adoption without subsequent amendments, unless the legislature has expressly or by strong implication shown its intention to incorporate subsequent amendments with the statute"); *see also United States v. Smith*, 296 F.3d 344, 347 n.1 (5th Cir. 2002) (noting that § 1114 "in its current form provides even broader coverage" than the pre-1996 version).

29

of limitation, but as a general term that incorporates by reference all the individuals protected under § 1114, both "officer[s] and employee[s]."[12]

---

[12] Bankoff argues that our construction of the phrase "an official whose killing would be a crime" under § 1114 renders superfluous the first three categories of persons covered by § 115 ("United States official[s]," "United States judge[s]," and "Federal law enforcement officer[s]"). (Appellant's Reply Br. at 8.) He apparently means that, if the fourth category of § 115 covers every "officer" or "employee" of the federal government, there would be no purpose for the first three categories. *See United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005) ("It is a well known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous.")

Though we need not consult the canons of construction where, as here, the meaning of statutory language is clear, *see United States v. Jones*, 471 F.3d 478, 480 (3d Cir. 2006), we in any event reject Bankoff's argument. When § 115 was enacted in 1984, the version of § 1114 then in force did not apply to *any* "officer or employee of the United States," but only to certain "officers," "employees," "agents," and "members" employed by various (and numerous) *specific* federal agencies. In any event, that there was some *overlap* between the individuals covered by § 1114 and the first three categories of persons protected by § 115—for example, the 1984 version of § 1114 already protected "any judge of the United States" or "United States magistrate," thus rendering § 115's enumeration of a "United States judge" unnecessary—does not mean that the first three categories are rendered superfluous by § 115's incorporation of

30

### 3.   The Legislative History

Even were we to lay aside the plain language of § 115 and consult its legislative history as a course marker, it would not aid Bankoff. *Cf. Albertini*, 472 U.S. at 680. He argues that the legislative history "'indicates that Congress was concerned with high policymaking, judicial and law enforcement officers, but that that legislative concern did not extend to federal employees in general.'" (Appellant's Br. at 17–18 (*quoting Fenton*, 10 F. Supp. 2d at 505).) He relies on the Senate Report that accompanies § 115, which begins:

[Section 115] is a new provision *designed to*

---

§ 1114. *Cf. United States v. Naftalin*, 441 U.S. 768, 778 (1979) ("'[t]he fact that there may well be some overlap'" between two statutes "'is neither unusual nor unfortunate'") (*quoting SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 468 (1969) (alteration in original)).

Finally, we note that Bankoff's proposed interpretation itself violates the anti-superfluousness canon. Had Congress intended, as Bankoff argues, to limit § 115's scope to only "officers" protected by § 1114, it presumably would have used the term "officer" instead of "official" in § 115. As we "assume that Congress used two terms because it intended each to have a particular, non-superfluous meaning," *Bailey v. United States*, 516 U.S. 137, 146 (1995), we cannot accept Bankoff's contention that Congress used the term "official" in § 115 to limit its scope to "officers" whose killing would be a crime under § 1114.

31

*protect the close relatives of certain high level officials*, such as the President, Vice-President, members of Congress, cabinet officers, and federal judges, as well as federal law enforcement officers. . . .

The Committee believes that serious crimes against family members of high level federal officials, federal judges, and federal law enforcement officers, which are committed because of their relatives' jobs are, generally speaking, proper matters of federal concern. Clearly it is a proper federal function to respond to terrorists and other criminals *who would seek to influence the making of federal policies and interfere with the administration of justice* by attacking close relatives of those entrusted with these tasks.

S. Rep. No. 98-225, at 263–64 (1983) (emphases added).

This argument falls short. Protecting the family members[13] of such "high policymaking" officials was undoubtedly an important (and probably the primary) purpose

---

[13] As initially enacted, § 115 applied only to threats against the family members of federal officials. In 1986, § 115 was amended to "extend[] protection to . . . the officials themselves." H. Rep. No. 99-797, at 14 (1986).

of the statute. However, we decline to draw from this the negative inference that Bankoff urges, *i.e.*, that because Congress was primarily concerned with protecting high-ranking policy makers, it must not have intended for § 115 to protect mere "employees." *See, e.g.*, *United States v. Turkette*, 452 U.S. 576, 591 (1981) ("that the legislative history forcefully supports" a "major purpose" of the statute, but does not address the statute's scope regarding the issue at hand, does not compel the "negative inference" that the statute does not also have other purposes (and thus scopes)).

Moreover, this excerpt from the Conference Report appears to address only the first three categories of individuals protected by § 115: "United States officials," "United States judges," and "Federal law enforcement officers." A later statement in the Conference Report specifically addresses the fourth category of persons covered by § 115:

> It should be noted that the new section [§ 115] covers attacks on family members of *all the persons listed* in 18 U.S.C. 1114 as well as on family members of other law enforcement officers not there listed. Included in this latter category would be, for example, the Inspectors General *and their staffs*, and Department of Justice Strike Force attorneys.

S. Rep. No. 98-225, at 264 (1983) (emphases added). Even assuming that the conference report's use of "persons" instead

33

of "officials" was a "stray choice of words," *Fenton*, 10 F. Supp. 2d at 505, its reference to "*all* the persons *listed*" in § 1114 comports with our conclusion that Congress intended § 115 to incorporate by reference all the individuals listed in § 1114 (and thus avoid restating that list in § 115 itself).[14]

In sum, even were we required to consult legislative history for § 115, it is consistent with our conclusion that Congress did not use "official" as a limitation on the categories of individuals protected by § 1114.

\* \* \* \* \*

---

[14] We also reject Bankoff's contention that we should presume that Congress did not intend to extend § 115's protection to "mere employees" in light of the principle that courts "should not interpret a statute in a manner that significantly alters the federal-state balance unless Congress has clearly indicated that it intended to do so." *United States v. Zwick*, 199 F.3d 672, 686 (3d Cir. 1999), *abrogated on other grounds by Sabri v. United States*, 541 U.S. 600 (2004). Section 115 is not a "general threat" statute. Even under our construction of that statute, it protects only employees of the *federal government*, and even then only when a threat is made in connection with (or in retaliation against) the performance of such a person's "official duties." Given that Congress has made it a crime to kill or attempt to kill such individuals (in § 1114), we see no "significant[] alter[ation in] the federal-state balance" that results from interpreting § 115 as applying to threats against them. *Zwick*, 199 F.3d at 686.

34

We hold that § 115 applies to all persons, be they "officer[s]" or "employee[s]," "whose killing would be a crime" under § 1114. We thus conclude that the District Court erred in ruling that an individual does not qualify as an "official" within the meaning of § 115 unless he or she is "authorized to make decisions on behalf of the government." This dispute over the correct interpretation of § 115 is the sole basis on which Bankoff challenges the District Court's denial of a judgment of acquittal on Count Two (the threats made against Tonik). Accordingly, we affirm the Court's denial of a judgment of acquittal on that Count, as we have no dispute that Tonik qualifies as an employee whose killing would be a crime under § 1114.

Like Tonik, it is undisputed that Robinson qualifies as a federal "employee" whose killing would be a crime under § 1114. Accordingly, we conclude the District Court erred in granting a judgment of acquittal on Count Three. However, Bankoff sought a judgment of acquittal on that Count on two additional grounds—that the evidence was insufficient to prove that he (1) made a "true threat" against Robinson, or (2) acted with the specific intent to impede, intimidate, or interfere with Robinson while she was engaged in the performance of her "official duties," or to retaliate against her "on account of the performance of h[er] official duties." 18 U.S.C. § 115(a)(1). The District Court did not reach those arguments, and neither Bankoff nor the Government addresses them in each's briefing. We decline to consider them in the first instance, and thus remand for the District Court to do so. *Cf. Gov't of the V.I. v. Charleswell*, 24 F.3d 571, 577 n.4 (3d Cir. 1994).

35

B.     Sixth Amendment Claim

Bankoff argues that the District Court violated his Sixth Amendment right to represent himself when the Court denied his requests to (1) give the opening statement for the defense, and (2) cross-examine the Government's first witness (Sphabmixy).  The Government argues that there was no constitutional deprivation because Bankoff's request was untimely, having been made after trial began (and after Bankoff had already withdrawn his request to proceed *pro se* mere days before trial).

The Sixth Amendment guarantees criminal defendants the right to represent themselves at trial.  *Faretta v. California*, 422 U.S. 806, 819–20 (1975).  The right of self-representation and the right to counsel are "two faces of the same coin, in that the waiver of one right constitutes a correlative assertion of the other."  *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970) (internal quotation marks and citation omitted).  However, because criminal defendants will likely fare better with the assistance of counsel than without, a defendant will be permitted to represent himself only when he "knowingly and intelligently" relinquishes his right to counsel.  *Faretta*, 422 U.S. at 835 (internal quotation marks and citation omitted).

We have established three requirements that must be met before a defendant may be allowed to proceed *pro se*: (1) he must "assert his desire to proceed *pro se* clearly and unequivocally"; (2) the court must "inquire thoroughly to satisfy

36

itself that" the request is knowing and intelligent; and (3) the court must "assure itself that the defendant is competent to stand trial." *Peppers*, 302 F.3d at 132 (internal quotation marks and citations omitted). Our review over a district court's findings regarding these requirements is plenary. *See United States v. Goldberg*, 67 F.3d 1092, 1097 (3d Cir. 1995).

We have previously stated that "the timing of the request is only one factor that a court must consider in ruling upon a motion to proceed *pro se*." *Buhl v. Cooksey*, 233 F.3d 783, 795 (3d Cir. 2000); *cf. Martinez v. Ct. of Appeal of Cal., Fourth App. Dist.*, 528 U.S. 152, 161–62 (2000) (recognizing that "most courts" have interpreted *Faretta* to require that a defendant assert his right to self-representation "in a timely manner"). Accordingly, we have held requests to proceed *pro se* timely even when made on the "eve of trial." *Buhl*, 233 F.3d at 795 (internal quotation marks and citation omitted); *Gov't of the V.I. v. James*, 934 F.2d 468, 470 (3d Cir. 1991) (request made on the first day of trial, but before jury selection, was timely); *see also, e.g.*, *Williams v. Bartlett*, 44 F.3d 95, 99 (2d Cir. 1994) (a defendant's right to represent himself is "*unqualified* if invoked prior to the start of the trial" (internal quotation marks and citation omitted) (emphasis in original)); *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir. 1990) (request is timely if made before the jury is empaneled); *Chapman v. United States*, 553 F.2d 886, 894 (5th Cir. 1977) (same).

However, after trial has "commenced"—*i.e.*, at least after the jury has been empaneled—"the right of self-representation

37

is curtailed." *Buhl*, 233 F.3d at 797 n.16. In that context, district courts have discretion to deny an untimely request to proceed *pro se* after weighing the "'prejudice to the legitimate interests of the defendant' against the 'potential disruption of proceedings already in progress.'"[15] *Id.* (*quoting United States v. Stevens*, 83 F.3d 60, 66–67 (2d Cir. 1996)); *accord United States v. Beers*, 189 F.3d 1297, 1303 (10th Cir. 1999); *United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994); *United States v. Betancourt-Arretuche*, 933 F.2d 89, 96 (1st Cir. 1991); *Horton v. Dugger*, 895 F.2d 714, 717 (11th Cir. 1990); *United States v. Oakey*, 853 F.2d 551, 553 (7th Cir. 1988); *United States v. Matsushita*, 794 F.2d 46, 51 (2d Cir. 1986); *United States v. Lawrence*, 605 F.2d 1321, 1325 (4th Cir. 1979). "How this balance should be struck is ultimately within the sound discretion of the district court," *Stevens*, 83 F.3d at 67, and we will review its decision under a highly deferential abuse-of-discretion standard. *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) (noting that deference "is the hallmark of abuse-of-discretion review").

Even assuming that the District Court's refusal to address Bankoff's untimely request until the end of the first day of trial resulted in a cognizable (though brief) "denial" of his right of self-representation, the Court did not abuse its discretion. In

---

[15] To be clear, we do not suggest that district courts are required to deny a request to proceed *pro se* made after a trial begins. *See United States v. Cocivera*, 104 F.3d 566, 570 (3d Cir. 1996).

light of Bankoff's repeated changes-of-heart and angry outburst during the prosecutor's opening statement, we think it apparent the Court was concerned that Bankoff's renewed request was equivocal (a finding that would justify denying even a timely request to proceed *pro se*). *See Williams*, 44 F.3d at 101 ("[W]hen a defendant changes his mind [about being represented by counsel] after trial begins, or does so repeatedly at any stage, . . . the conduct can be considered vacillation, and a trial judge may find the request equivocal."); *see also United States v. Stine*, 675 F.2d 69, 72 (3d Cir. 1982) ("In discretionary matters dependent upon observation of the litigants, an appellate court's review is limited because it cannot replicate the trial judge's superior vantage point.").

In that light, we have no trouble concluding that, by deferring an inquiry of Bankoff's renewed request until the end of the first day of trial (and outside the presence of the jury), the District Court appropriately balanced the "prejudice to [Bankoff's] legitimate interests . . . against the potential disruption" of the trial. *Buhl*, 233 F.3d at 797 n.16 (internal quotation marks and citation omitted). We thus reject Bankoff's implicit contention that the Court was required to adjourn the trial immediately to address his request once he interrupted the prosecutor's opening statement and renewed his demand to proceed *pro se*.

In addition, the District Court not only permitted Bankoff to begin representing himself the second day of trial, but (1) allowed him to re-call the first Government witness (whom his

39

attorney already had cross-examined), and (2) permitted standby counsel to take over the questioning of Bankoff's father when his father became (understandably) emotional and had difficulty answering questions. In this context, we believe the Court not only acted well within its discretion, but treated Bankoff with the utmost fairness. Accordingly, we reject Bankoff's Sixth Amendment claim.

* * * * *

We vacate the District Court's grant of a judgment of acquittal on Count Three, affirm its other rulings on appeal, and remand this case for further proceedings.