# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 9, 2021       Decided September 3, 2021

No. 19-3042

UNITED STATES OF AMERICA,
APPELLEE

v.

LONNELL TUCKER,
APPELLANT

———

Consolidated with 19-3043, 19-3078

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cr-00267-1)
(No. 1:18-cr-00267-2)
(No. 1:18-cr-00267-6)

———

*Paul S. Rosenzweig*, appointed by the court, argued the cause for appellant Anthony Fields. *Amelia Schmidt*, appointed by the court, argued the cause for appellant Abdul Samuels. With her on the briefs was *Matthew G. Kaiser*, appointed by the court. *Stephen C. Leckar*, appointed by the court, argued the cause for appellant Lonnell Tucker.

*Daniel J. Lenerz*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Gregory P. Rosen*, Assistant U.S. Attorneys.

Before: KATSAS, RAO, and WALKER, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: Appellants Anthony Fields, Abdul Samuels, and Lonnell Tucker were convicted on several drug- and firearm-related offenses. Each appellant challenges his convictions, and Samuels also challenges his sentence. We affirm.

I

In May 2018, a grand jury indicted Fields, Samuels, Tucker, and three other individuals on several charges related to an alleged drug-dealing conspiracy. The indictment stemmed from an investigation by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) of drug activity at Next Level Cuts, a barbershop in the District of Columbia.

Much of the government's evidence came from searches in the months preceding the indictment. During a traffic stop in November 2017, officers found what appeared to be a drug ledger, approximately $9,000, and drug paraphernalia in Fields's vehicle. The ATF executed a search warrant on the barbershop three months later. In a suite above the barbershop, agents found cash, firearms, more drug paraphernalia, and large quantities of narcotics — heroin mixed with fentanyl, PCP, Suboxone, and synthetic marijuana. In the same room, they also found a document listing a medical appointment for Fields and a receipt for a purchase made with his credit card. A search of Fields's home led to more drug ledgers, two of

which listed "Foots" (*i.e.*, Samuels). During the ensuing searches of Samuels's home, ATF agents found a shotgun, drug paraphernalia, crack cocaine, marijuana, and synthetic marijuana. During the search, Samuels admitted that he kept the gun under his bed for protection.

Also central to the government's case was testimony from Byran Clark, a drug dealer who purportedly worked for Fields. Clark testified that Fields ran a drug operation out of the barbershop's upstairs suite and that Samuels often acted as a gatekeeper to the suite. He also reported that Tucker sold drugs out of the barbershop and frequented the suite.

Five defendants proceeded to trial. One pleaded guilty during the trial. The jury returned a mixed verdict as to the other four. It acquitted one defendant on the sole charge against him. It also acquitted Fields and Samuels on several firearms- and narcotics-related charges. But it found Fields, Samuels, and Tucker guilty of conspiracy to distribute and possess with intent to distribute various narcotics. *See* 21 U.S.C. §§ 841, 846.[1] It also found Fields guilty of possessing with intent to distribute each of the narcotics alleged in the conspiracy. *Id.* § 841(a). And it found Samuels guilty of possessing with intent to distribute cocaine base, *id.*, of possessing synthetic marijuana, *id.* § 844, and of felony possession of a firearm, 18 U.S.C. § 922(g).

The district court sentenced Fields to 192 months of imprisonment, Samuels to 84 months of imprisonment, and

---

[1] The jury found Fields guilty of conspiring to distribute PCP, heroin, fentanyl, buprenorphine, marijuana, and synthetic marijuana. Samuels was found guilty of conspiring to distribute heroin and fentanyl. And Tucker was found guilty of conspiring to distribute heroin.

Tucker to 60 months of imprisonment. All three appealed and collectively raise eight claims. We address each claim in turn.

II

We start with Fields, who contends that the police officers who searched him and his vehicle in November 2017 lacked a sufficient basis to conduct their traffic stop, violating the Fourth Amendment. Prior to the search, officers conducting undercover surveillance on a store known to sell drug paraphernalia witnessed Fields exit the store. The officers followed him. Fields drove to a nearby parking lot where another person entered Fields's car and then left after less than two minutes. Suspecting a drug sale and wanting to remain undercover, the officers called for backup and followed Fields to another nearby parking lot.

When backup officers arrived, they observed Fields illegally speed through that parking lot and then park. They momentarily observed Fields before they approached him and asked for his driver's license and registration. "Due to his nervous behavior and furtive movements," they then asked Fields to step out of his car and keep his hands away from his pockets. App. 145.

Contrary to the instruction, Fields made "constant furtive movements towards his pockets." *Id.* So the backup officers conducted a pat down, during which Fields spontaneously uttered "that white powder in my pocket is a supplement." *Id.* The "white powder" was Mannitol, a known cutting agent for cocaine. *Id.* at 146.

The backup officers also found $2,000 in cash and a ledger on Fields. Inside his car, a K-9 found another $7,001 in cash and multiple bottles with concealed "false bottoms containing

trace amounts of white powder." *Id.* Fields was subsequently arrested.

Months later, in February 2018, ATF agents applied for a search warrant of Fields's car and the barbershop, which was suspected of being a stash house. The 18-page application included a paragraph about the November 2017 stop. After a court granted the search warrant, ATF agents found additional evidence of Fields's drug trafficking.

Before trial, Fields challenged the legality of the vehicular stop and search warrant. The district court held an evidentiary hearing on the stop. Sergeant Chaney (one of the two undercover officers) and Officer Haskett (one of the backup officers) both testified. The court found their testimony credible, concluded that there was probable cause to stop Fields, and denied Fields's suppression motion. The court also denied Fields's motion to suppress evidence from the February 2018 search.

As to the November 2017 stop, Fields challenges the court's findings that (1) the officers were credible, and (2) there was probable cause for the stop. In addition, he disputes the district court's rejection of his argument regarding the 2018 search, and he now adds an argument not raised in the district court — that the evidence from the February 2018 search warrant should be suppressed as poisonous fruit of the allegedly unlawful November 2017 stop.

A

As for the officers' credibility, we review the district court's findings for clear error. *United States v. Delaney*, 955 F.3d 1077, 1081–82 (D.C. Cir. 2020). And we reverse "when a district court credits *exceedingly improbable testimony*."

*United States v. Delaney*, 651 F.3d 15, 18 (2001) (cleaned up) (emphasis added).

Fields offers three reasons for reversal.

First, he argues that because Officer Haskett did not immediately stop him or take the necessary steps to cite him for speeding, no speeding actually occurred. But that conclusion does not follow from those facts. Officer Haskett was taking steps to cite Fields for speeding until he discovered evidence of a more serious crime — Fields's drug trafficking. It is therefore understandable the stop did not end how it began.

Second, Fields makes much of Sergeant Chaney's statement that he could not recall "[i]f there were any obvious reasons for the stop." App. 118. What Chaney actually said, when asked if he could recall "[i]f there were any obvious reasons for stop," was: "I believe there were, but off the top of my head, I couldn't tell you what it was. *Id.* But in any event, Sergeant Chaney was not even the officer who conducted the stop. Cause for the stop here depends on what was seen by Officer Haskett. And he recalled that Fields was speeding.

Third, Fields argues that Officer Haskett's testimony that Fields "was going a little fast," *id.* at 133, is inconsistent with his written report that Fields was "traveling at a high rate of speed through the parking lot" and that officers approached Fields to confront him "about speeding through the parking lot," *id.* at 145.

That argument, however, distorts Officer Haskett's testimony, which included at least five statements about Fields's driving:

(1) "I saw a silver Range Rover *speeding* through the parking lot";

(2) Fields "was *going a little fast* for people to — for [him] *to react to people walking across the road*";

(3) "I already had probable cause to stop the vehicle because of *speeding*";

(4) "I don't know the exact speed limit, but I do know that he was *driving faster than he should* if people are walking with their children and families shopping"; and

(5) Fields's "[s]*peed* [was] *greater than reasonable*."

Hr'g Tr. 9, 11, 31, ECF No. 246 (emphases added).

Contrary to Fields's argument, there is no genuine inconsistency between the written report and the totality of Officer Haskett's testimony. One can imagine a case where it might matter whether a defendant was barely speeding or dangerously speeding. But this is not that case. All that matters is that Fields committed a traffic violation.

The district court did not err in finding the officers' testimony credible. And we, like the district court, rely on it for the next part of our analysis.

B

We review the district court's determination that there was a legal basis for the stop *de novo*. *See Delaney*, 955 F.3d at 1081–82.

Because Officer Haskett observed Fields speeding, he had probable cause for the stop. It is well settled that a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Sheffield*,

832 F.3d 296, 302 (D.C. Cir. 2016) (quoting *Whren*, 517 U.S. at 810).[2]

We will not consider Fields's argument that the speeding was merely a pretextual justification for the stop because the Supreme Court's precedents "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren*, 517 U.S. at 813. So too do this court's precedents. *See Sheffield*, 832 F.3d at 302–03.

We affirm the district court's denial of Fields's motion to suppress.

C

Because Officer Haskett lawfully stopped Fields, there is no poisonous tree from which poisonous fruit could fall. Moreover, Fields forfeited his argument that the evidence from the February 2018 search warrant should be suppressed as fruit of the poisonous tree by not raising that argument in district court. "[S]uppression arguments that are not presented to the trial court are deemed waived and cannot be argued on appeal." *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (cleaned up).

III

Fields next argues that the district court erred when it denied his request to represent himself at trial. Fields had a difficult relationship with his attorneys throughout the prosecution. He fired his first attorney in 2018. Three months

---

[2] Even without probable cause, an officer's reasonable suspicion is alone enough to justify a traffic stop. *See Heien v. North Carolina*, 574 U.S. 54, 60 (2014).

before trial, he fired that attorney's successor. And then, seven days into trial, he tried to fire his third attorney. At that point, over his co-defendants' objections, Fields moved to represent himself. When the district court asked why, Fields said his attorney had not had time to learn the details of the case. He also believed his attorney was not "aggressive enough" during the trial. App. 361. The district court denied Fields's request, noting they were far along in the trial and Fields's self-representation at that juncture might harm his co-defendants.

Fields asks us to review the district court's decision *de novo*. But when a defendant's request to represent himself is made *after* trial has begun, we review the district court's decision for abuse of the court's "considerable discretion." *United States v. Noah*, 130 F.3d 490, 498 (1st Cir. 1997); *see also United States v. Washington*, 353 F.3d 42, 46 (D.C. Cir. 2004) (applying abuse of discretion standard).

"A person accused of a crime has an absolute right, under the Sixth Amendment, to represent himself *only* if he asserts that right *before trial*." *Washington*, 353 F.3d at 46 (emphases added). But if asserted *after* a trial begins, the right of self-representation is qualified. It must yield to other interests when those interests, such as harm to co-defendants, outweigh it. *See United States v. Bankoff*, 613 F.3d 358, 373–74 (3d Cir. 2010) ("However, after trial has commenced — *i.e.*, at least after the jury has been empaneled — the right of self-representation is curtailed. In that context, district courts have discretion to deny an untimely request to proceed *pro se* after weighing the prejudice to the legitimate interests of the defendant against the potential disruption of proceedings already in progress. How this balance should be struck is ultimately within the sound discretion of the district court, and we will review its decision under a highly deferential abuse-of-discretion standard.") (cleaned up); *United States v. Walker*, 142 F.3d 103, 108 (2d

Cir. 1998) ("Once a trial has begun, the defendant's right to self-representation is sharply curtailed.  In cases in which the request is made following the commencement of the trial, the district judge must balance the prejudice to the legitimate interests of the defendant against the potential disruption of proceedings already in progress.  On appeal, considerable weight will be given to the district court's assessment of this balance.") (cleaned up); *see also United States v. Dougherty*, 473 F.2d 1113, 1124 (D.C. Cir. 1972).

Citing this court's concern in *United States v. Washington* that a defendant's request to make his own closing argument may be an attempt to tell his story while evading cross-examination, *see* 353 F.3d at 46, Fields says, "At most, *Washington* stands for the proposition that a defendant may be denied self-representation when the request is an effort to game the system." Appellants' Br. 42. We disagree. Although a defendant's attempt to manipulate the process is a sufficient reason to deny a mid-trial request for self-representation, it is not a necessary reason.  Prejudice to co-defendants is also a sufficient reason.  So too is disruption of the proceedings. *Bankoff*, 613 F.3d at 373.

Here, the district court stated it could not "ignore the interests and the rights of the other defendants in this case." App. 367.  It thoroughly explained to Fields his request would "risk harming" his co-defendants, "whether it's by a question you ask; whether it's by some objection you make or by an objection you don't make." *Id.*  The court then again noted its duty to "not only consider your rights but the rights of these four other men" and concluded "the rights of these four other men will be jeopardized." *Id.*  Therefore, the court denied Fields's mid-trial request, "given the late juncture and the amount of time that has passed in this case and where we find ourselves in this case." *Id.*

"A trial involving a *pro se* defendant and co-defendants who are assisted by counsel is pregnant with the possibility of prejudice." *United States v. Veteto*, 701 F.2d 136, 139 (11th Cir. 1983) (cleaned up). In this case, the reasons to fear that possibility — listed above by the district court — were compelling. And the district court could have added to those reasons Fields's erratic trial attendance and unwarranted hostility to fair proceedings. *See, e.g.*, Appellee's Supp. App. 422 (Fields: "I'm being railroaded here, man. I'm being railroaded here. I said this from the beginning that we wasn't going to get no justice in this court."); *id.* at 424 (Fields refused to attend afternoon trial proceedings); App. 372 (Fields: "I'm fighting the prosecution and I'm fighting you." Court: "You're not fighting me." Fields: "I'm definitely fighting you.").

The district court did not abuse its considerable discretion when it denied Fields's request to represent himself.

IV

Fields raises two ineffective-assistance-of-counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, he must show (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that the error prejudiced his defense. *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (cleaned up). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Id.* at 105. We "must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Id.* at 104.

Because Fields's claims are raised for the first time before this Court, we have two options — remand for an evidentiary hearing or reject them outright. The latter is permitted when defendants present their claims in a vague or conclusory

manner, when the trial record shows no deficient performance, or when that record shows no prejudice. *United States v. Sitzmann*, 893 F.3d 811, 831–32 (D.C. Cir. 2018) (per curiam); *United States v. Rashad*, 331 F.3d 908, 909–10 (D.C. Cir. 2003).

Here, every paragraph of Fields's brief — with the possible exception of his third of five paragraphs, noted below — is conclusory. And even when his arguments are at their least conclusory, the trial record shows no deficient performance or prejudice.

A

His first claim is laid out in four paragraphs. He begins in paragraph one by alleging that the relationship with his attorneys — recall that he fired the first two, and tried to fire the third — was "broken" and that their investigations were not "adequate":

> As we set forth above, Mr. Fields had a broken relationship with each of his attorneys. With respect to the first two, Mr. McCants and Mr. Retureta, one aspect of their ineffectiveness is already identified in the record but requires further exploration on remand — namely, their lack of adequate investigation.

Appellants' Br. 48.

Then in paragraph two, Fields describes his version of the evidence against him:

> As the Court is aware from the recitation elsewhere in this brief there was limited direct evidence against Mr. Fields. No surveillance

> photos showed him engaging in drug transactions. The only testimonial evidence against him came from a cooperating witness who, like all such witnesses, had mixed motivation. Thus, the main ground for Mr. Fields' conviction lay in the Government's attempt to tie him to drugs found in a room on the second floor above the barbershop. His alleged constructive possession of the goods found in that room was a critical piece of the government's case in chief.

*Id.*

Next, in paragraph three, Fields comes as close as he gets to a non-conclusory argument. He alleges other people had access to a room above the barbershop where he kept personal items and instrumentalities of drug trafficking. And he faults his initial attorneys for not finding them. But he never says how many people had access, who they were, or why we should believe that these unidentified people actually exist — aside from Fields's entirely self-serving "insiste[nce]" that they do:

> And thus, negating that inference of constructive possession was a vital component of Mr. Fields' defense. Throughout the time prior to trial, Mr. Fields insisted that other individuals also had keys to the room above the barbershop — a fact which, if established, would have afforded him the opportunity to argue the insufficiency of the government's evidence attempting to attribute those drugs to him. Yet, Mr. Fields' initial attorney, Mr. McCants, does not appear to have conducted the investigation necessary to evaluate Fields's

> requests. And Mr. Fields maintains that there is no evidence that Mr. Retureta pursued that investigation, either.

*Id.* at 48–49 (cleaned up).

Even assuming this, Fields's least conclusory paragraph, is sufficiently non-conclusory — which is doubtful — it was neither deficient performance nor prejudicial for his counsel not to investigate "other individuals" with "keys to the room above the barbershop" where Fields kept cash, drugs, drug paraphernalia, and personal items. Connecting others to the room would not have eliminated the evidence connecting Fields to the room. So even if his attorney had investigated the unnamed "other individuals," and even if they too were drug dealers, the jury would have learned nothing more than the unremarkable fact that Fields, a drug dealer, hung out and shared space with other drug dealers. *Cf.* Trial Tr. 69, ECF No. 312 ("[D]espite the fact that you heard Mr. Fields in person and on the phone again and again and again talk about how everybody has got keys, everybody has access . . . , [m]ultiple people can jointly have property in their constructive possession. That's the concept of both constructive possession and a conspiracy. It's teamwork.").

Finally, in paragraph four, Fields ends his first claim where he began — by repeating his conclusory claim that his attorneys should have "conduct[ed] an investigation":

> As the Supreme Court recently put it: "Counsel . . . has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the

circumstances, applying a heavy measure of deference to counsel's judgments." Here, no assessment has been made as to the judgment of counsel in failing to conduct an investigation — manifestly necessitating an evidentiary inquiry.

*Id.* at 49 (cleaned up).

## B

Fields's other (conclusory) claim is laid out in one paragraph — paragraph five. There he alleges his attorney did not adequately cross-examine Clark, the government's witness who identified him as the leader of the conspiracy. But Fields identifies no question his attorney should have asked that would have impeached Clark or exculpated Fields. Instead, Fields faults his attorney for not mentioning the absence of call records reflecting Clark's conversations with Fields. The absence of evidence, however, is not evidence of absence. So the absence of call records would not, in Fields's words, have "exploit[ed] inconsistencies" in Clarks's testimony. *Id.* And Fields fails to specify any other purported inconsistencies:

> In addition, at an evidentiary hearing Mr. Fields would also establish the reasons for his dissatisfaction with the representation provided by Ms. West, whose cross-examination of the cooperating witness, Byran Clark, was in Mr. Fields' view inadequate. She failed to exploit inconsistencies between the proffers that Mr. Clark earlier had made to the government and his sworn testimony. By way of example, although Clark contended that he was in frequent contact with Mr. Fields there were no

call records — none — reflecting conversations between them.

*Id.*

In short, Fields does little more than state his "dissatisfaction" with his attorneys based on an investigation and cross-examination he deems inadequate for the vaguest of reasons and then conclude that this alone entitles him to relief. But we reject conclusory claims that leave out specific reasons for counsel's deficient performance and prejudice under *Strickland*. It is not nearly enough for Fields to simply state his dissatisfaction and then conclude that his dissatisfaction satisfied *Strickland*. We will therefore not remand Fields's ineffective-assistance-of-counsel claims for an evidentiary hearing and instead reject those claims.[3]

V

We now turn to Samuels's claims. He first contends that his trial counsel, Joseph Conte, provided ineffective assistance. Samuels primarily argues that Conte was ineffective under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), which requires the defendant to show "(1) that his lawyer acted under an actual conflict of interest" and (2) that the conflict caused "an actual lapse in representation." *United States v. McGill*, 815 F.3d 846, 943 (D.C. Cir. 2016) (cleaned up); *see Cuyler*, 446 U.S. at 349. Because *Cuyler* relaxes *Strickland*'s prejudice

---

[3] We also hold a non-conclusory argument would have fared no better. With regard to Clark's testimony, the performance of Fields's trial attorney was not deficient or prejudicial. She repeatedly elicited purported inconsistencies between his pre-trial statements and trial testimony, as did three attorneys for Fields's co-defendants. Fields's attorney even made the point about the absence of text messages in her closing argument.

requirement, we are "reluctant to allow defendants to force their ineffective assistance claims into the 'actual conflict of interest' framework and thereby supplant the strict *Strickland* standard." *United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998) (cleaned up). We thus closely scrutinize claims under *Cuyler*.

Samuels argues that Conte was conflicted because his daughter worked for the U.S. Attorney's Office for the District of Columbia, which prosecuted Samuels. Although Conte mentioned his daughter's job to the prosecutor, he informed neither Samuels nor the district court. Shortly before Samuels's sentencing, the district court learned about the issue, appointed new counsel, and ordered briefing. The court concluded that Conte's failure to disclose his daughter's job raised a potential conflict of interest, and it set an evidentiary hearing on that issue. Later, the court granted the parties' joint motion to vacate the hearing without resolving the conflict issue. Now on appeal, Samuels again contends that Conte had a conflict of interest.

As discussed, we ordinarily remand "colorable and previously unexplored claims of ineffective assistance" for evidentiary hearings. *United States v. Marshall*, 946 F.3d 591, 596 (D.C. Cir. 2020) (cleaned up); *see McGill*, 815 F.3d at 942. But remand is unwarranted where the record establishes that counsel was not ineffective, where the appellant's allegations are vague and conclusory, or where the appellant fails to identify an issue that "requires a determination of facts." *Sitzmann*, 893 F.3d at 832 (cleaned up). Moreover, our standard for remand is blunted by "the strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment," which extends to claims under *Cuyler*. *Taylor*, 139 F.3d at 934 (cleaned up); *see also Burger v. Kemp*, 483 U.S. 776, 784 (1987) ("[W]e generally

presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client.").[4]

We assume that Conte was conflicted and resolve this appeal under *Cuyler*'s second prong, which considers whether the conflict led to an "actual lapse in representation." *McGill*, 815 F.3d at 943 (cleaned up). To satisfy this standard, Samuels must articulate a strategy that a reasonable, nonconflicted defense counsel would have pursued. *See United States v. Gantt*, 140 F.3d 249, 254 (D.C. Cir. 1998). The conflict must have caused the failure to pursue this strategy, *United States v. Bruce*, 89 F.3d 886, 896 (D.C. Cir. 1996), and must have "significantly affected counsel's performance . . . rendering the

---

[4] We are skeptical that Samuels preserved his ineffective-assistance claim. "The law in this circuit is that a claim of ineffective assistance must be made in a motion for a new trial 'when counsel changes prior to appeal and when there is still a reasonable opportunity to challenge a conviction in the District Court.'" *United States v. Wood*, 879 F.2d 927, 933 (D.C. Cir. 1989) (quoting *United States v. Debango*, 780 F.2d 81, 86 (D.C. Cir. 1986)). Before he appealed, Samuels received new counsel and pressed a claim that his former counsel was ineffective because of a conflict of interest. Moreover, after the district court set an evidentiary hearing to explore the conflict issue, Samuels — acting through his new counsel — affirmatively moved to proceed without a hearing. Nevertheless, the government waived any forfeiture (or waiver) argument by stipulating that it would not raise that issue in the joint motion to vacate the evidentiary hearing. *See United States v. Layeni*, 90 F.3d 514, 522 (D.C. Cir. 1996). The government's stipulation is not binding on us, *see Weston v. WMATA*, 78 F.3d 682, 685 (D.C. Cir. 1996), and we have significant concern with remanding now for a hearing that Samuels affirmatively eschewed. But because we may reject Samuels's *Cuyler* claim on the present record, we accept the stipulation and proceed to the merits.

verdict unreliable, even though *Strickland* prejudice cannot be shown," *Mickens v. Taylor*, 535 U.S. 162, 173 (2002).

Under this standard, Conte's failure to tell anyone other than the prosecutor about his daughter's job is not itself enough to establish ineffective assistance. *Cuyler* "requires proof of effect upon representation." *Id.* Without more, the "inadequate disclosure" of a conflict is "not an adverse effect on counsel's performance." *United States v. Mett*, 65 F.3d 1531, 1536 (9th Cir. 1995); *see Blake v. United States*, 723 F.3d 870, 878, 881–82 (7th Cir. 2013). And Samuels does not explain how Conte's limited disclosure so significantly affected his performance as to make the verdict unreliable.

To show an adverse effect, Samuels identifies three points that he claims Conte failed to raise. According to Samuels, Conte (1) missed an argument supporting a motion to suppress his statement about the shotgun found under his bed, (2) failed to timely oppose expert testimony on drug distribution, and (3) did not cite evidence to support a multiple-conspiracy instruction. Samuels posits that Conte avoided these points to advance his daughter's interests as an employee in the U.S. Attorney's office — *i.e.*, he "pulled punches that a reasonable, conflict-free counsel would have thrown." Appellants' Br. 51. Samuels concludes that these failures make his verdict unreliable. We disagree.

To begin, Samuels failed to identify any plausible link between the alleged conflict and the points that Conte purportedly missed. *See Bruce*, 89 F.3d at 896. His theory of causation — that Conte "pulled punches" to help his daughter — is belied by the trial record, which shows that the punches Conte threw were no less forceful than the ones he ostensibly pulled. For example, as explained below, Conte sought to sever Samuels's trial from Fields's, which would have

considerably increased the government's workload, *see Richardson v. Marsh*, 481 U.S. 200, 210 (1987). He also forcefully challenged the credibility of the government's central witness and offered alternative explanations for why Samuels appeared on Fields's ledger (to pay for car insurance) and for why Samuels identified the shotgun (to cover for his girlfriend). With no distinction between these arguments and the ones that Conte ostensibly missed, Samuels's theory of causation is not plausible.

Separate from causation, none of the purportedly missed arguments identifies a plausible lapse in representation. The first concerns Conte's unsuccessful motion to suppress Samuels's admission that he owned the shotgun agents found in his house. Conte had argued that the admission was involuntary because Samuels was suffering from heroin withdrawal at the time. The district court disagreed. On appeal, Samuels faults Conte for not also arguing that the statement was involuntary because he was under the influence of cocaine.

Conte's failure to make this argument was not a colorable lapse in representation. The "mere fact that one has taken drugs, or is intoxicated, or mentally agitated, does not render consent involuntary." *United States v. Castellanos*, 518 F.3d 965, 969 (8th Cir. 2008) (cleaned up). Instead, "coercive police activity" is necessary to find a confession involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). And the district court, in rejecting the heroin-withdrawal argument, found that the audio recording of Samuels's confession showed "no coercive police activity." App. 89. It would thus have been futile to argue that Samuels's consent was involuntary due to cocaine use. And the failure to raise a meritless objection is not colorably deficient. *See Sitzmann*, 893 F.3d at 833.

Second, Samuels argues that Conte failed to investigate or timely challenge testimony from a government expert that the amount of cocaine seized from Samuels's home — approximately 3.5 grams — was consistent with distribution rather than personal use. Conte moved to exclude the testimony on the day of the expert's testimony, but the district court denied the motion as untimely.

Samuels again identifies no colorable deficiency. For one thing, he does not explain why the motion to exclude the expert testimony might have been successful if timely, so this argument is too vague and conclusory to support remand. *See id.* at 832–33. He instead contends that Conte failed to develop evidence to counter the government's expert. But Conte forced the expert to concede that the amount of cocaine in Samuels's possession could have been for personal use. And he relied heavily on the possibility of personal use in his closing arguments, contending, for example, that Samuels owned a scale because he bought in bulk and did not want to be cheated. In other words, Samuels faults Conte for not offering cumulative evidence to support personal use, which is not enough for remand. *See id.* at 833.

Finally, Samuels contends that Conte botched his request for a multiple-conspiracy instruction, which would have clarified that the jury needed to find that Samuels was a member of the same conspiracy charged in the indictment to support a guilty verdict. In denying Conte's request, the district court reasoned that there was no evidence of Samuels "interacting with anyone else . . . who's not identified as a conspirator in this case." App. 609. Samuels contends that there was such evidence, which Conte missed, namely Clark's testimony that Samuels obtained crack cocaine to distribute in Virginia from "a guy named Miguel Harris." *Id.* at 391. The

indictment mentioned neither Harris nor a conspiracy to distribute crack cocaine.

It is at least plausible that Samuels would have received the multiple-conspiracy instruction had Conte flagged this evidence. If requested, a district court must give the instruction where the "record evidence supports the existence of multiple conspiracies." *United States v. Sanders*, 778 F.3d 1042, 1047 (D.C. Cir. 2015) (cleaned up). And Clark testified that Samuels "started purchasing" crack from Harris for distribution. App. 391. This testimony could perhaps support the inference that Harris was a "regular source," which would be enough to create a separate conspiracy. *United States v. Morris*, 836 F.2d 1371, 1374 (D.C. Cir. 1988).

But Conte's failure to secure the instruction is not enough to show that a conflict "significantly affected" his performance and made the verdict "unreliable." *Mickens*, 535 U.S. at 173. Whatever the contours of this standard, the failure to recall a single line of testimony in a three-week trial that might support a peripheral jury instruction cannot fairly be described as significant. Moreover, it casts no doubt on the verdict, which found that Samuels was guilty of conspiring to distribute heroin and fentanyl, not crack cocaine. Samuel's case thus falls well outside *Cuyler*, which "is designed to protect a defendant when it is impossible to reconstruct what might have occurred without counsel's conflict of interest." *Plunk v. Hobbs*, 766 F.3d 760, 766 (8th Cir. 2014).

Samuels alternatively contends that Conte was ineffective under *Strickland*, which requires him to show that his counsel's performance was deficient and prejudicial, *see* 466 U.S. at 687. For the reasons given above, Samuels has not proven deficient performance. And because he does not satisfy *Cuyler*'s lower standard to prove a "significant[]" effect on representation, he

also fails to satisfy *Strickland*'s more demanding requirement of prejudice. *Mickens*, 535 U.S. at 173.

In sum, Samuels has established no colorable claim of ineffective assistance under *Cuyler* or *Strickland*. His *Cuyler* claim fails because he has not plausibly proven that Conte's alleged conflict of interest caused an adverse effect that rises to the level of an actual lapse in representation. And his *Strickland* claim fails for lack of any colorable case for deficient performance or prejudice.

VI

Samuels next argues that the district court impermissibly limited his ability to cross-examine Clark, the government's central witness, about his prior bad acts. When Clark testified, he had previously pleaded guilty to kidnapping and obstruction of justice as part of a plea agreement that depended on his cooperation against Samuels in this case. Samuels claims that Clark earned the kidnapping charge by taking a person hostage at gunpoint, robbing him, and pointing a gun at the victim's head. For obstruction of justice, Samuels contends that Clark directed a third party to threaten a witness to not testify. Clark also had other prior convictions, including one for murder. Samuels sought to cross-examine Clark about his convictions and the facts underlying them to impeach Clark's credibility and to establish that the plea agreement gave Clark a bias.

The district court adopted a halfway approach, explaining that it had to balance the probative value of Clark's prior bad acts against the risk that the facts would "just dirty [him] up because he's a bad dude." App. 428. The court allowed Samuels to cross-examine Clark about the existence of his prior convictions; about the facts underlying charges the government reduced, dropped, or never brought due to Clark's cooperation; and about other possible sources of bias. But it excluded

questions about the facts underlying his convictions, reasoning that they would be "more prejudicial than probative." Appellee's Supp. App. 490. It also agreed with the government that those questions risked a "circus within a circus, a trial within a trial" about Clark. App. 433–34. Finally, it refused to let Samuels question Clark about the alleged witness intimidation after concluding that Samuels had no factual basis in the record to assume a threat occurred.

Samuels contends that the district court's ruling violated both the Confrontation Clause and Federal Rule of Evidence 403. Under the Confrontation Clause, a trial court "may limit cross-examination only after there has been permitted, as a matter of right, a certain threshold level of cross-examination." *United States v. Hall*, 945 F.3d 507, 513 (D.C. Cir. 2019) (cleaned up). That threshold is satisfied "so long as defense counsel is able to elicit enough information to allow a discriminating appraisal of a witness's motives and bias." *Id.* (cleaned up). Otherwise, district courts "retain wide latitude" to "impose reasonable limits on . . . cross-examination" under the Federal Rules of Evidence. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Relevant here, Rule 403 allows courts to exclude evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice" or "confusing the issues." We review limits on cross-examination for an abuse of discretion. *United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996); *Henderson v. Geo. Wash. Univ.*, 449 F.3d 127, 133 (D.C. Cir. 2006).

The district court did not violate the Confrontation Clause. Such a violation occurs "only when the court bars a legitimate line of inquiry that might have given the jury a significantly different impression of the witness's credibility." *United States v. Miller*, 738 F.3d 361, 375 (D.C. Cir. 2013) (cleaned up). Samuels elicited ample testimony to give the jury the

impression that Clark was lawless and had a substantial reason to testify in favor of the government. Among other impeaching facts, the jury learned about Clark's cooperation agreement; his prior convictions; and that he robbed and kidnapped a man, stole a car, and used a firearm during various crimes. This cross-examination easily clears the threshold required by the Confrontation Clause. *See, e.g.*, *Hall*, 945 F.3d at 513 (no violation where defendant cross-examined government witness on guilty plea in cooperation deal).

Nor did the district court abuse its discretion under Rule 403. Without acknowledging the court's concerns about unfair prejudice, Samuels argues that the salacious facts underlying Clark's prior convictions are "information the jury should have heard to evaluate whether someone with that little regard for human life and the law would have any compunction about lying under oath to reduce his time in prison." Appellants' Br. 75. But while "evidence of lawlessness can undermine the perpetrator's probable truthfulness . . . admission of such evidence is subject to the sound discretion of the trial court." *United States v. Garcia Sota*, 948 F.3d 356, 363 (D.C. Cir. 2020); *see also* FED. R. EVID. 609(a)(1)(A). And the court here acted well within its discretion in concluding that the risk of unfair prejudice stemming from the facts it excluded substantially outweighed any cumulative probative value. This Court has long acknowledged the risk that evidence of prior criminal activity would impermissibly lead juries to discredit witnesses because they are "bad men," rather than because they are biased or not credible. *United States v. Fox*, 473 F.2d 131, 135 (D.C. Cir. 1972). Thus, "when evidence of a prior conviction is admitted for purposes of impeachment, cross-examination is usually limited to the essential facts rather than the surrounding details of the conviction." *United States v. Baylor*, 97 F.3d 542, 544 (D.C. Cir. 1996). Not only did the district court allow cross-examination on the essential facts of

Clark's convictions, it let the jury hear about a wide range of Clark's other criminal activity. We find no error in the district court's limited restrictions on Clark's cross-examination.

Samuels also contends that the details underlying the obstruction charge are particularly probative because they involved a threat to intimidate a witness. But the district court did not limit questions about witness intimidation based on Rule 403. As noted, it restricted those questions because Samuels lacked a factual basis to ask them. *See Lin*, 101 F.3d at 768 ("counsel must have a reasonable basis for asking questions on cross-examination which tend to incriminate or degrade the witness") (cleaned up). In his reply brief, Samuels objects that the district court erroneously discounted evidence that provided a factual basis for the questions. This objection is forfeited, *see M.M.V. v. Garland*, 1 F.4th 1100, 1111 (D.C. Cir. 2021), and also meritless. Samuels points to no record evidence suggesting that Clark threatened a witness. Instead, he gestures at unspecified grand-jury testimony that he admits is not in the record, which is not good enough. *See United States v. Boyd*, 54 F.3d 868, 871–72 (D.C. Cir. 1995) (basis for cross-examination must be in the record). Samuels also faults the government for not providing further evidence to support its representation that Clark's obstruction charge did not involve threats. But an objection to limits on cross-examination is not the appropriate vehicle to challenge the government's compliance with discovery obligations. Samuels held the burden of proffering a sufficient factual basis to question Clark about threats. *See Lin*, 101 F.3d at 768. And the district court did not abuse its discretion when it ruled that he failed to satisfy that burden.

Moreover, any error by the district court would have been "rendered fully harmless by the broad range of other heinous conduct that the court allowed defense counsel to bring out in

cross-examination." *Garcia Sota*, 948 F.3d at 363; *see Van Arsdall*, 475 U.S. at 684; *United States v. Whitmore*, 359 F.3d 609, 622 (D.C. Cir. 2004). As explained, Samuels extracted testimony from Clark about his convictions and the facts underlying several violent crimes for which the government declined to prosecute him. Samuels's inability to elicit similar impeaching evidence was harmless because the cross-examination "was enough to enable the jury to assess the relation between [Clark's] lawlessness and his propensity for truthfulness." *Garcia Sota*, 948 F.3d at 363.

In sum, the district court acted well within its discretion under the Confrontation Clause and Rule 403 in limiting Clark's cross-examination, and any improper limits would have amounted to harmless error.

## VII

We next consider the arguments made by Samuels and Tucker that the district court abused its discretion in denying their motions to sever their trials from Fields's trial. Samuels and Tucker argue that severance was warranted due to "spillover" prejudice resulting from the disparity in evidence between them and Fields as well as Fields's obstreperous behavior during trial. Fields, the undisputed ringleader of the drug distribution conspiracy, frequently displayed less than exemplary behavior in court. At one point, he absented himself from the trial for part of a day. Towards the end of trial, Fields testified on his behalf. He was the only defendant to do so, and the testimony did not go well. Fields gave conflicting and unbelievable explanations for the evidence against him, accused the government of planting evidence, speculated about the government's motives for prosecuting him and his co-defendants, and became combative with the prosecutor and the district court. Both before and after Fields's testimony,

Samuels and Tucker moved to sever their trials on the ground that Fields's lies and misbehavior would be held against them by the jury. The district court denied this motion, explaining that Fields's credibility was a matter for the jury to decide and that Fields did not say anything "about the other defendants that already didn't come in the government's case-in-chief." App. 725.

"We review the denial of a motion to sever for abuse of discretion." *United States v. Wilson*, 605 F.3d 985, 1015 (D.C. Cir. 2010). The Federal Rules of Criminal Procedure permit joinder of defendants "alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." FED. R. CRIM. P. 8(b). Joint trials are preferred in federal criminal cases because they "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (cleaned up). The preference for joint trials is "'especially strong' when 'the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve . . . defendants who are charged, *inter alia*, with participating in the same illegal acts.'" *Wilson*, 605 F.3d at 1016 (cleaned up). We find that neither the disparity in evidence between co-defendants, nor Fields's behavior during trial, warranted severance because any risk of prejudice was curable with appropriate instructions.

A joined defendant may seek to sever his trial from that of his co-defendants. "If the joinder of . . . defendants . . . appears to prejudice a defendant . . . , the court *may* . . . sever the defendants' trials, or provide any other relief that justice requires." FED. R. CRIM. P. 14(a) (emphasis added). The permissive language of this rule makes clear that severance is not required "even if prejudice is

shown." *Zafiro*, 506 U.S. at 538–39. Instead, Rule 14 grants a district court "significant flexibility to determine how to remedy any potential risk of prejudice posed by the joinder of multiple defendants in a single trial." *United States v. Moore*, 651 F.3d 30, 95 (D.C. Cir. 2011) (per curiam). Severance is the exception rather than the rule and is required only when there is "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Although a serious risk may arise when "defendants are tried together in a complex case and they have markedly different degrees of culpability," even in cases where the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* In light of these principles, motions to sever should be granted "sparingly." *United States v. Celis*, 608 F.3d 818, 844 (D.C. Cir. 2010).

Appellants "carr[y] the burden of demonstrating prejudice resulting from a failure to sever." *United States v. Gooch*, 665 F.3d 1318, 1336 (D.C. Cir. 2012). Samuels and Tucker here assert spillover prejudice, namely the risk "the jury would use evidence of one defendant's guilt against another." *United States v. Spriggs*, 102 F.3d 1245, 1256 (D.C. Cir. 1996). They maintain this prejudice arose from trying them, peripheral players in the conspiracy, together with Fields, "a perjurious and obstructionist lead defendant." Appellants' Br. 97. Samuels and Tucker fail to demonstrate prejudice.

First, Samuels and Tucker have not demonstrated prejudice from evidentiary spillover. Disparity in evidence requires severance "when the evidence against one defendant is 'far more damaging' than the evidence against the moving party," but will not require severance in a conspiracy trial when there is "substantial and independent evidence of each

defendant's significant involvement in the conspiracy." *Moore*, 651 F.3d at 95–96 (cleaned up). "[A]bsent a *dramatic* disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to give individual consideration to each defendant." *Id.* at 95 (cleaned up). The varying roles played by members of a conspiracy will "not render joint trial inappropriate as long as the jury can reasonably compartmentalize the substantial and independent evidence against each defendant." *United States v. Straker*, 800 F.3d 570, 628 (D.C. Cir. 2015) (per curiam). As we will explain in Part VIII, the government introduced substantial and independent evidence of Samuels's and Tucker's involvement in the conspiracy. Although Samuels and Tucker played a subordinate role in the conspiracy led by Fields, we hold "the disparity of evidence did not rise to a level necessary to mandate severance." *Moore*, 651 F.3d at 96.

Second, Samuels and Tucker have not established prejudice from Fields's misbehavior during trial. Courtroom misconduct by a co-defendant must be especially egregious to mandate severance. *See, e.g.*, *United States v. Rocha*, 916 F.2d 219, 229 (5th Cir. 1990) (no severance required when co-defendant "mouthed the words, 'You are dead,' and moved a finger across his throat" during a witness's direct examination); *United States v. Marshall*, 458 F.2d 446, 448, 452 (2d Cir. 1972) (no severance required when a co-defendant directed obscenities at the court and witnesses, absented himself, threw a chair towards the jury box, and cut his wrists during summation). "Cautionary instructions . . . should remain the primary weapons against improper jury bias." *United States v. Mannie*, 509 F.3d 851, 857 (7th Cir. 2007). Fields's behavior was mildly disruptive: he was combative on the stand, refused to attend part of the trial, and made demonstrably false statements during his testimony. This misbehavior is simply not so beyond the pale as to mandate severance.

At bottom, this is not a case in which curative instructions were ineffective against potential prejudice. The district court gave several careful and tailored instructions throughout the trial. When Fields failed to show up one day, the district court instructed the jury that his "absence should not . . . be viewed as evidence or held against any other defendant in this matter in any way whatsoever." App. 347. The district court also instructed the jury that "each defendant is entitled to have the issue of his guilt as to each of the crimes for which he's on trial determined from his own conduct and from the evidence that applies to him as if he were being tried alone." Appellee's Supp. App. 784–85. The instructions explicitly stated that the jury's verdict as to one defendant should not "influence [its] verdict with respect to any other defendant as to that count or any other count in the Indictment." *Id.* at 785. The effectiveness of the district court's instructions is indicated by the jury returning mixed verdicts as to each of the defendants, including Fields. *See United States v. Gilliam*, 167 F.3d 628, 636 (D.C. Cir. 1999) (explaining that mixed "verdicts indicate that the jury was able to distinguish between the defendants"). We presume that juries follow the court's instructions when, as here, there is no evidence to the contrary. *Id.*

The district court cured any potential prejudice to Samuels and Tucker with limiting instructions and did not abuse its discretion in denying their motions to sever.

VIII

We turn next to Samuels's and Tucker's challenge to the sufficiency of the evidence to sustain their convictions for conspiracy to distribute heroin under 21 U.S.C. § 846.

To overturn a jury verdict for insufficient evidence, "a defendant faces a high threshold." *United States v. Washington*, 12 F.3d 1128, 1135 (D.C. Cir. 1994). In reviewing for

sufficiency of the evidence, we consider "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Gaskins*, 690 F.3d 569, 576–77 (D.C. Cir. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In applying this standard, we "draw[] no distinction between direct and circumstantial evidence, and 'giv[e] full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" *United States v. Williams*, 836 F.3d 1, 6 (D.C. Cir. 2016) (quoting *United States v. Battle*, 613 F.3d 258, 264 (D.C. Cir. 2010)).

To convict Samuels and Tucker of conspiracy to distribute heroin, the government had to prove they acted knowingly and with the "specific intent to further the conspiracy's objective." *United States v. Childress*, 58 F.3d 693, 708 (D.C. Cir. 1995). The evidence here easily passes muster under our deferential standard of review.

With respect to Samuels, sufficient evidence supports that he knowingly furthered the conspiracy to distribute heroin. Fields controlled operations in the drug distribution conspiracy from the suite above the barbershop, where agents found approximately $60,000 worth of heroin as well as other drug paraphernalia. The evidence established that Samuels assisted Fields in this endeavor. Clark, the cooperating witness who testified that he frequently went to the barbershop to obtain heroin from Fields, placed Samuels regularly with Fields while Fields packaged drugs for distribution. GPS data from Samuels's cellphone also put him in the vicinity of the barbershop hundreds of times during the life of the conspiracy. As Clark testified, Samuels assisted Fields by opening the door and controlling access to the upstairs suite where the drugs were, which was corroborated by text messages to Samuels that

included "let me in" and "open the door." Appellee's Supp. App. 191–92. Text messages also demonstrated that Samuels was in frequent contact with other members of the conspiracy and used coded references to drug transactions. Moreover, Clark testified that Samuels had delivered five grams of heroin on one occasion when Clark was in a car with two other members of the conspiracy. Viewed in the light most favorable to the government, this evidence, combined with Samuels's frequent presence in the barbershop while Fields, the leader of the conspiracy, engaged in drug transactions, is sufficient to sustain Samuels's conviction for conspiracy to distribute heroin. *See, e.g.*, *Childress*, 58 F.3d at 712 (finding the evidence sufficient when defendants personally handled drugs, prepared them for sale, and did so at the direction of the conspiracy's leader).

Sufficient evidence also supported Tucker's conviction and established his role as a street-level dealer in the conspiracy. Clark's testimony put Tucker at the barbershop frequently, "[a]cting like [Tucker had] a license to sell drugs . . . [h]aving . . . no discretion, . . . no trying to hide it or anything, just out in the open." Appellee's Supp. App. 457. Tucker's frequent presence at the barbershop was corroborated by GPS data and law enforcement surveillance. Notably, agents observed Tucker engaged in "what appeared to be a hand-to-hand narcotics transaction" on the street in front of the barbershop. *Id.* at 363. Clark testified that he saw Tucker coming from the upstairs suite of the barbershop adjusting his "lower crotch area," and explained that when he used to sell drugs, he hid his stash in his "crotch area" to avoid detection by the police. *Id.* at 458. Clark also explained that heroin could be pink or tan depending on the substance it was cut with and that dealers often used slang to talk about narcotics. Tucker's text messages mentioned selling pink shirts and tan shoes, statements the jury could reasonably infer were references to

narcotics. Given Tucker's close relationship with Fields and frequent presence at the barbershop, the jury also could reasonably infer that Tucker obtained the heroin he sold from Fields. Viewing the evidence in the light most favorable to the government, sufficient evidence supported Tucker's conviction for conspiracy to distribute heroin.

Samuels and Tucker also seek to rely on *Gaskins*, in which this court found the evidence insufficient to sustain a drug-trafficking conspiracy conviction. In that case, despite extensive police surveillance and searches, no evidence put Gaskins in the presence of drugs, nor did any witness connect him to the conspiracy. *See* 690 F.3d at 572. Tucker argues that the evidence against him is similarly flimsy because he did not directly text members of the conspiracy, and Clark's testimony and the street-level buys at most established his role as an independent street-level dealer. Samuels also points to the lack of controlled buys, wiretaps, or surveillance as reasons why the evidence against him was insufficient. These arguments founder on the fact that the evidence against both Samuels and Tucker was far more robust than the evidence in *Gaskins*. Unlike Gaskins, both Samuels and Tucker "discussed drugs, distributed drugs, [and were] in the presence of drugs connected to the conspiracy." *Gaskins*, 690 F.3d at 577; *see also United States v. Shi*, 991 F.3d 198, 207 (D.C. Cir. 2021) (distinguishing *Gaskins* as a case in which there was an "overwhelming lack of evidence").

For these reasons, the evidence is sufficient to sustain the convictions of Samuels and Tucker.

IX

Tucker also challenges his sentence, arguing that the district court erred in calculating the quantity of heroin attributable to him for purposes of setting his Sentencing

Guidelines range. Although the district court's calculation was based on inferences, those inferences were reasonable in light of the record.

We "review[] a sentence imposed under the Guidelines to determine whether it is 'reasonable.'" *United States v. Flores*, 995 F.3d 214, 219 (D.C. Cir. 2021) (quoting *United States v. Blalock*, 571 F.3d 1282, 1285 (D.C. Cir. 2009)). This determination involves two steps: First, we ensure the district court did not commit a "significant procedural error," and second, we review whether the sentence is objectively reasonable. *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). Tucker challenges only the district court's methodology for calculating the drug quantity attributable to him — a procedural error. Significant procedural errors include "failing to calculate (or improperly calculating) the [Sentencing] Guidelines range, . . . selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51.

A defendant's sentence for a drug conspiracy is based on the amount of drugs attributed to him. Under the Sentencing Guidelines, a defendant's base offense level is derived from his "relevant conduct," which includes the drug quantity involved for an offense. U.S.S.G. § 1B1.3 (2018) (cleaned up); *United States v. Burnett*, 827 F.3d 1108, 1120 (D.C. Cir. 2016). When necessary, such as when there has been "no drug seizure or the amount seized does not reflect the scale of the offense," the district court must approximate the drug quantity. U.S.S.G. § 2D1.1 cmt. n.5. Further, when a defendant is part of a drug conspiracy, his relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *United States v. Bostick*, 791 F.3d 127, 158 (D.C. Cir. 2015) (quoting U.S.S.G.

§ 1B1.3(a)(1)(B)). "We review the District Court's determination of drug quantity relevant for sentencing under a clear error standard." *United States v. Mack*, 841 F.3d 514, 527 (D.C. Cir. 2016).

The district court attributed 75 grams of heroin to Tucker. Although the presentence report found Tucker's relevant conduct included 546.7 grams due to his involvement in the conspiracy, the district court declined to hold Tucker responsible for all the sales made from the barbershop or to Clark. Instead, it estimated the amount of heroin for which Tucker was personally responsible. Based on the amount of heroin sold by Tucker to the confidential informant (0.58 grams), the GPS data, Clark's testimony, and surveillance, the district court estimated that Tucker sold 0.5 grams of heroin five times weekly for thirty weeks, totaling 75 grams. That quantity resulted in a Guidelines range of 51 to 63 months, and with Tucker's career offender enhancement, the range increased to 210 to 262 months. The district court found this range overstated Tucker's criminal history, so it used the sentences received by other members of the conspiracy as benchmarks and ultimately sentenced Tucker to sixty months' imprisonment. The district court's calculation of the drug quantity attributable to Tucker, which was based on reliable evidence in the record, was not clearly erroneous.

Tucker argues the district court erred by using a method for calculating the drug quantity for his base offense level that was "unduly speculative." Appellants' Br. 105. We find, however, that the district court employed a reasonable method, which resulted in a conservative estimate. While it found "Tucker was part of a core group of individuals that operated out of that barbershop," Appellee's Supp. App. 794, it chose not to attribute the 546.7 grams of heroin recommended by the presentence report. The court instead used the amount of

heroin Tucker distributed in a single controlled buy to extrapolate five similarly sized sales per week for thirty weeks. Although one sale is a small sample size, that does not render the court's extrapolation unduly speculative, particularly when it results in a conservative estimate. *Cf. United States v. Correa-Alicea*, 585 F.3d 484, 491 (1st Cir. 2009) (affirming a district court's use of two controlled purchases multiplied by a "highly conservative" "estimate of one transaction per day"). In addition, the district court's estimation that five sales per week were of heroin is reasonable based on Tucker's frequent presence at the barbershop and the quantity of heroin seized there. "[D]rug quantity calculations are an art, not a science," and the district court chose a reasonable method. *United States v. Block*, 705 F.3d 755, 760–61 (7th Cir. 2013) (explaining "we afford trial courts some room for speculation and reasonable estimation so long as percentages and quantities were not pulled out of thin air") (cleaned up).

In sum, the district court did not clearly err in calculating the drug quantity attributable to Tucker.

## X

For the foregoing reasons, we affirm.

*So ordered.*