**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JACQUELINE ANDERSON,
*Defendant-Appellant.*

No. 20-50207

D.C. Nos.
2:19-cr-00157-CJC-1
2:19-cr-00157-CJC

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted December 8, 2021
Pasadena, California

Filed August 25, 2022

Before: William A. Fletcher, Johnnie B. Rawlinson, and
John B. Owens, Circuit Judges.

Opinion by Judge Rawlinson;
Dissent by Judge W. Fletcher

## SUMMARY*

### Criminal Law

The panel affirmed Jacqueline Anderson's jury conviction for threatening a person assisting federal officers and employees in violation of 18 U.S.C. § 115(a)(1)(B).

Anderson threatened to kill a Protective Security Officer while he was on duty at the Long Beach Social Security Office. The PSO was an employee of a private company that had been contracted by the Federal Protective Service to "provide security services at government-owned and leased properties."

Section 115(a)(1)(B) prohibits threats against "a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under section 1114 of this title." 18 U.S.C. § 1114 prohibits killing or attempting to kill "any officer or employee of the United States or of any agency in any branch of the United States Government . . . while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties."

Agreeing with the Third and Eighth Circuits, the panel held that the plain language of § 115(a)(1)(B) includes all persons described in § 1114. The panel rejected Anderson's argument that the word "official" was a "term of limitation"

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

intended to protect only those "officials" designated in § 1114. The panel held that, because, under § 1114, the PSO was assisting with official duties, Anderson's conduct violated § 115, and the district court properly denied her motion for a judgment of acquittal.

Dissenting, Judge W. Fletcher wrote that § 115(a)(1)(B) clearly did not support Anderson's conviction because the PSO was not an "official." Judge W. Fletcher wrote that the restrictive clause of § 115(a)(1)(B) indicates that the target of the threat must not only be a federal official, but must also be a federal official whose killing would be a crime under § 1114. Put differently, § 115(a)(1)(B) protects federal officials, but only the subset of federal officials whose killing would be a crime under § 1114. Judge W. Fletcher wrote that the Third and Eighth Circuit cases addressed a different question and did not support the majority's statutory reading. Judge W. Fletcher wrote that the PSO, the target of Anderson's threat, was not a federal official, but rather was a "person assisting . . . an officer or employee" of the United States; therefore, under the plain meaning of the statute, Anderson did not violate § 115(a)(1)(B).

## COUNSEL

Gia Kim (argued), Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California, for Defendant-Appellant.

David R. Friedman (argued), Assistant United States Attorney; Bram M. Alden, Chief, Criminal Appeals Section; Tracy L. Wilkison, Acting United States Attorney; United

States Attorney's Office, Los Angeles, California; for
Plaintiff-Appellee.

**OPINION**

RAWLINSON, Circuit Judge:

We readily acknowledge that 18 U.S.C. § 115 is not a
model of legislative clarity. However, that is nothing new.
*See, e.g.*, *United States v. Lucero*, 989 F.3d 1088, 1096
(9th Cir. 2021) (describing the Clean Water Act as "not the
most artfully drafted"); *see also In re HP Inkjet Printer Litig.*,
716 F.3d 1173, 1181 (9th Cir. 2013) (noting the "bewildering
wording" of the Class Action Fairness Act) (citation and
internal quotation marks omitted). We are not the first court
to find the statutes and cross-references of issue here to be
unclear. *See United States v. Wynn*, 827 F.3d 778, 783 (8th
Cir. 2016) (describing § 115 as a "strangely-worded statute").
But the lack of clarity does not negate our obligation to
ascertain the intent of Congress in enacting the statute.[1]
Having done so, we conclude that the district court correctly

---

[1] Contrary to the dissent's insinuation, a lack of clarity does not
equate to ambiguity. *See Dissenting Opinion*, p. 22. Although 18 U.S.C.
§ 115 could have been more clearly drafted, it is not ambiguous. *See
Chowdhury v. I.N.S.*, 249 F.3d 970, 972 (9th Cir. 2001) ("We must first
determine whether there is any ambiguity in the statute using traditional
tools of statutory interpretation. . . .") (citation omitted). Thus, the rule of
lenity is not triggered. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8
(2016) ("Th[e] rule [of lenity] applies only when a criminal statute
contains a grievous ambiguity or uncertainty, and only if, after seizing
everything from which aid can be derived, the Court can make no more
than a guess as to what Congress intended.") (citation and internal
quotation marks omitted).

included a Protective Security Officer (PSO) within the persons covered under the provisions of § 115, and AFFIRM the judgment of conviction.[2]

## I. Background

Defendant Jacqueline Anderson (Anderson) was convicted of violating 18 U.S.C. § 115(a)(1)(B) by threatening a person assisting federal officers and employees. Anderson threatened to kill PSO Justin Bacchus (PSO Bacchus) while he was on duty at the Long Beach Social Security Office (Social Security Office). We have jurisdiction to review Anderson's appeal under 28 U.S.C. § 1291.

### A. The Incident and The Indictment

At all times relevant to this case, PSO Bacchus was an employee of a private company that has been contracted by the Federal Protective Service (FPS) to "provide security services at government-owned and leased properties." FPS is the federal agency responsible for protecting federal buildings. Given the sheer number of facilities within its jurisdiction, FPS relies on contractors to protect facilities that it does not have the capacity to cover.

---

[2] We are not persuaded by our colleagues' contention that the statute "is very clear [and] does not support the conviction." *Dissenting Opinion*, p. 22. Under the dissent's reading of the statute, the language is clear only if the portions of § 115 incorporating 18 U.S.C. § 1114 are ignored. Of course, such a reading flouts a cardinal rule of statutory construction—that each word in the statute be given effect. *See Hamazaspyan v. Holder*, 590 F.3d 744, 749 (9th Cir. 2009) ("Where possible, we are required to give each word of a statute meaning. . . .") (citation omitted).

On a typical day, the Social Security Office tasks three PSOs with screening and processing the office's visitors. The first PSO is stationed outside the main entrance and is responsible for directing visitors to either the "appointment" or "general information" line. The second PSO is assigned to screen and check bags for prohibited items. The third PSO is stationed at the metal detector to ensure that no weapons are brought into the office. The three PSOs rotate through these positions throughout the day.

On the morning of December 12, 2018, PSO Bacchus was outside, screening and processing visitors to the Social Security Office. Anderson arrived at the Social Security Office just before 11:15 that morning. She approached PSO Bacchus and informed him that she had an appointment. When PSO Bacchus was unable to verify that Anderson had an appointment, he directed her to the "general information" line.

PSO Bacchus' response angered Anderson. She became aggressive, and her voice "got louder." Initially she refused to move; but eventually, went to the back of the line as directed.

Shortly thereafter, an older man approached PSO Bacchus. The man did not have an appointment either, so PSO Bacchus instructed him to go to the back of the "general information" line as well. Despite PSO Bacchus' instruction, moments later, the man was near the front of the line with Anderson. Because PSO Bacchus knew that the man "didn't go to the back of the line and make his way to the front that quickly," he decided to approach the man. However, Anderson "jumped in the conversation and told [PSO Bacchus that the man] didn't have to go anywhere." She

continued: "I don't give a f*** about you or none of these illegal Mexicans," and that she didn't "care about the rules of the Social Security Administration." She then turned to PSO Bacchus and said, "F*** you, b**** a** n****."

PSO Bacchus informed Anderson that her behavior was "becoming a problem for the other people in line" and that she "cannot be speaking like that." Anderson had become so "loud[]" and "unruly" that PSO Kraft came outside to help PSO Bacchus de-escalate the situation. Despite the PSOs' attempts at de-escalation, Anderson persisted in "[c]ursing, getting loud, and just being very, like, aggressive in her manner." Ultimately, PSO Bacchus decided that, given Anderson's behavior, he could not allow her into the building.

When PSO Bacchus informed Anderson that she would not be allowed into the Social Security Office and would have to come back the next day, Anderson became "[v]ery upset." She blocked the door to the Social Security Office and refused to leave. Rather than moving Anderson—and to avoid further escalating the situation—PSO Kraft decided to open another door to allow visitors to enter and exit. As Anderson continued to block the entrance, she told PSO Bacchus that she "would not move" and that she didn't "care about [his] job and she'll get [his] black a** fired."

When PSO Whiteside came outside to help PSOs Bacchus and Kraft diffuse the situation and spoke to Anderson, she once again "yelled" and cursed. After PSO Whiteside went back inside, Anderson continued to block the door.

Eventually, Anderson turned toward her car to leave the Social Security Office. But as she walked away, she told PSO Bacchus: "I'm going to go to my car and get my gun and blow your f***ing brains out."

Anderson's tone was "loud" and made PSO Bacchus feel "threatened," "afraid," and "like she might carry out the action." Wanting to "make sure [he] heard what was said to [him]," PSO Bacchus responded, "Excuse me?" "What did you say?" Anderson continued toward her car and replied, "You heard me."

PSO Bacchus immediately informed PSOs Kraft and Whiteside that Anderson had threatened him. PSO Bacchus "felt scared" and "feared for [his] life." He was also concerned about the "other people in line based off . . . what she said about illegal immigrants." Consequently, the PSOs decided to leave their posts, and follow Anderson to her car. They planned to detain her, or at the very least, get her license plate number so they could report the threat.

Although Anderson drove away in a "[f]ast, aggressive" manner before the PSOs were able to detain her, they recorded her license plate number. They also reported the incident, and "stayed on alert" for "two or three days."

After an investigation by FPS, Anderson was charged in a single count indictment with threatening a person assisting federal officers and employees in violation of § 115(a)(1)(B). The indictment alleged that Anderson:

> knowingly threatened to assault and murder
> victim [PSO Bacchus], a Protective Security
> Officer employed by Paragon Systems,

> assisting officers and employees of the United States Social Security Administration ("SSA") in the Long Beach, California field office, with the intent to impede, intimidate, and interfere with victim [PSO Bacchus] while victim [PSO Bacchus] was engaged in, and on account of, the performance of official duties, and with the intent to retaliate against victim [PSO Bacchus] on account of the performance of official duties.

## B. The Trial

During trial, PSOs Bacchus, Kraft and Whiteside all testified on behalf of the government about their interaction with Anderson. Anderson did not call any witnesses, but moved under Federal Rule of Criminal Procedure 29 (Rule 29) for judgment of acquittal on the basis that PSO Bacchus is not an "official" for the purposes of § 115(a)(1)(B). She contended that "[t]he only evidence put on during the government's case [wa]s that a threat was made toward a private security guard in the employ of Paragon Systems."

The district court declined to rule on the motion until after the jury returned its verdict. Meantime, the jury was instructed that:

> The second element the government must prove beyond a reasonable doubt is that, at the time the threat was made, Protective Security Officer Bacchus was a federal official.

A "federal official" includes officers and employees of the United States *and any person assisting an officer or employee of the United States while such an officer or employee is engaged in the performance of official duties.* Officers and employees of the Social Security Administration and the Federal Protective Service, which is part of the Department of Homeland Security, are officers and employees of the United States. It is for you to determine if Protective Security Officer Bacchus was an officer or employee of the United States or a person . . . assisting officers or employees of the United States at the time the threat was made.

(Emphasis added).

The jury convicted Anderson of violating 18 U.S.C. § 115(a)(1)(B), and the court subsequently denied Anderson's Rule 29 motion. After being sentenced to one year of probation and a fine, Anderson filed a timely notice of appeal.

## II. Discussion

Anderson challenges the district court's denial of her Rule 29 motion for judgment of acquittal. She argues on appeal that PSO Bacchus is not an "official" under 18 U.S.C. § 115(a)(1)(B). This argument presents a question of

statutory interpretation, which we decide de novo. *See United States v. Pacheco*, 977 F.3d 764, 767 (9th Cir. 2020).[3]

Anderson was charged under § 115(a)(1)(B) which provides in pertinent part:

> Whoever . . . threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, *or an official whose killing would be a crime under section 1114 of this title, . . .* with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished . . . .

18 U.S.C. § 115(a)(1)(B) (2018) (emphasis added).

---

[3] The government argues that Anderson waived her claim that PSO Bacchus is not an "official" covered by 18 U.S.C. § 115(a)(1)(B) by failing to raise it in a pretrial motion as required by Federal Rule of Criminal Procedure 12(b)(3). We are unpersuaded by this argument. Even if the government is correct and Anderson was required to raise this claim before trial, the claim is not waived because the district court addressed it on the merits in a written decision. *See United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) ("Even where a waiver argument may be available, when a court rules on the merits of an untimely suppression motion, it implicitly concludes that there is adequate cause to grant relief from a waiver of the right to seek suppression. . . .") (citation, alteration, and internal quotation marks omitted).

In turn, § 1114 provides, in relevant part, that:

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, *or any person assisting such an officer or employee in the performance of such duties* or on account of that assistance, shall be punished . . .

18 U.S.C. § 1114(a) (2018) (emphasis added).

In cases requiring statutory interpretation, "our starting point is the plain language of the statute." *United States v. Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011). Our review of the statute's plain language involves an examination of "the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *Id.* (citation omitted). Our analysis is informed by decisions from other circuit courts that have interpreted the statute, and we will not create a circuit split unnecessarily. *See Seven Arts Filmed Ent. Ltd. v. Content Media Corp.*, 733 F.3d 1251, 1255 (9th Cir. 2013) (taking guidance from two of our sister circuits when resolving an issue of first impression); *see also Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017) ("declin[ing] to create a circuit split unless there is a compelling reason to do so") (citation omitted).

Although we have not previously considered the issue presented by Anderson's appeal, two of our sister circuits have held that § 115(a)(1)(B) includes all individuals covered

by 18 U.S.C. § 1114.  *See United States v. Bankoff*, 613 F.3d 358, 360 (3rd Cir. 2010); *see also Wynn*, 827 F.3d at 783–85.

The Third Circuit was the first federal appellate court to resolve the question of the scope of § 115(a)(1)(B).  In *Bankoff*, the defendant was convicted of threatening two Social Security Administration employees in violation of § 115(a)(1)(B).  *See* 613 F.3d at 360.  The first employee was a claims representative (indictment Count Three) and the second was an operations supervisor (indictment Count Two). *See id.*  The district court granted the defendant's motion for judgment of acquittal on Count Three on the basis that the claims representative was not an "official" under § 115(a)(1)(B), because her responsibilities were limited to "routine and subordinate functions."  *Id.*  The defendant's motion for judgment of acquittal on Count Two was denied. *See id.* The district court reasoned that because an operations supervisor "had the authority to adjudicate claims on behalf of the federal government," she was an "official."  *Id.*  On appeal, the Third Circuit affirmed the district court's denial of the defendant's motion for judgment of acquittal on Count Two and vacated the acquittal on Count Three.  *See id.*  The Third Circuit reasoned that both the claims representative and the operations supervisor were "official[s]" under § 115(a)(1)(B).  *Id.*

To reach this conclusion, the Third Circuit reviewed the text, context, and legislative histories[4] of §§ 115(a)(1)(B) and 1114.  *See id.* at 365–72.  The court began by rejecting the defendant's argument that "Congress could not have intended

---

[4] The court noted that because the language of § 115 was "plain," consulting legislative history was not required, but considered only as a "course marker."  *Bankoff*, 613 F.3d at 371.

that § 115 apply to threats against employees 'whose killing would be a crime under' § 1114 by referring to threats against 'official[s] whose killing would be a crime under' § 1114" because the terms "official" and "employee" have different ordinary meanings. *Id.* at 365. The court reasoned that § 115 "prohibits threats against four categories of individuals—'United States officials,' 'United States judges,' 'Federal law enforcement officers,' and 'officials whose killing would be a crime under' § 1114." *Id.* at 366 (alterations omitted). Although only the first three terms are explicitly defined by the statute, the court was persuaded that "Congress intended for § 1114 itself to define th[e] [fourth] category by incorporating it by reference into § 115." *Id.* (citation omitted). Thus, the court held, the ordinary dictionary definition of "official" is not controlling. *Id.* at 366–67.

The court was not convinced by the defendant's argument that if Congress had intended to have § 115 apply to all persons listed in § 1114, it would have used language like "any *person* designated in section 1114," as it did in 18 U.S.C. § 111. *Id.* at 367 (emphasis in the original). Rather, the court concluded that Congress' use of different language to incorporate § 1114 into "different statutes that were codified nearly four decades apart—§ 111 in 1948, and § 115 in 1984" did not portend that "it used the term 'official' (as opposed to 'person') in § 115 with the intention of limiting its scope." *Id.* (footnote reference omitted).

The *Bankoff* defendant's final argument centered on the legislative history of §§ 115 and 1114. *See* 613 F.3d at 371. The defendant maintained that the legislative history of the two provisions "indicates that Congress was concerned with high policymaking, judicial and law enforcement officers, but

that . . . legislative concern did not extend to federal employees in general." *Id.* The court rejected this contention, concluding that even if "Congress was primarily concerned with protecting high-ranking policy makers," there was no indication in the legislative history that Congress did not intend to protect "mere employees" as well. *Id.* (internal quotation marks omitted).

After its thorough review of the text and legislative histories of the statutes, the Third Circuit concluded that "Congress did not use 'official' [in § 115] as a limitation on the categories of individuals protected by § 1114." *Id.* at 372.

In *Wynn*, the defendant also challenged his conviction under § 115(a)(1)(B) by arguing that the supervisor he threatened was not a federal "official." 827 F.3d at 783. The Eighth Circuit was unpersuaded, reasoning that in context, the wording of § 115(a)(1)(B) "strongly suggests" that the term "official" was defined by a cross-reference to the "universe of federal 'officials' covered by § 1114." *Id.* Citing *Bankoff*, the Eighth Circuit observed that the defendant's argument relied on an interpretation of § 115(a)(1)(B) that is contrary to the statutory history of §§ 115(a)(1)(B) and 1114. *Id.* at 783–84. Although acknowledging that § 1114 has been cross-referenced in other statutes containing words broader than "official," the Eighth Circuit was nevertheless persuaded that "there is nothing in the legislative history of these other statutes, or of the later amendments to § 115(a)(1)(B) and § 1114, that suggests Congress intended to change, or to clarify, the fundamental relationship between' § 115 and § 1114." *Id.* at 784 (citation, alteration, and internal quotation marks omitted). This "fundamental relationship" is that § 115(a)(1)(B) incorporates § 1114 in its entirety. *Id.* at 784–85.

We are similarly persuaded that the plain language of § 115 incorporates all persons described in § 1114. Section 115(a)(1)(B) criminalizes threatening to assault, kidnap or murder "a United States official, a United States judge, a Federal law enforcement officer, *or an official whose killing would be a crime under* [*section 1114*]." 18 U.S.C. § 115(a)(1)(B) (emphasis added). Congress explicitly delineated the defined categories of "United States official," "United States judge," and "Federal law enforcement officer," in § 115. *Id.* § 115(c). This phrasing "strongly suggests" that the following phrase—"official whose killing would be a crime under section 1114"—was not intended to be an undefined term. *Wynn*, 827 F.3d at 783; *see also Bankoff*, 613 F.3d at 366. Logically and linguistically speaking, the definition can only be found in the language of § 1114. *See id.*

Anderson argues that we should reject the plain reading of § 115 and instead interpret the statute using the ordinary meaning of "official." She suggests that the word "official" in § 115 is a "term of limitation" intended to protect only those "official[s]" designated in § 1114. Anderson therefore contends, that even if PSO Bacchus was assisting with official duties, he was not an "official" within the ordinary meaning of that term, or in a similar position as the "official[s]" specifically delineated in § 1114.

Our colleague in dissent parrots Anderson's argument. But this argument makes sense only if the word "official" is considered in isolation without consideration of those individuals described in § 1114. We, like the Third Circuit, find this narrow reading unpersuasive. As the Third Circuit wrote in *Bankoff*:

> [W]e think it implausible that Congress used the term "official" as a limitation on the persons enumerated in § 1114, yet declined to define that term or provide any indication as to how courts (or presumably juries) were to determine which of the enumerated "employees," "officers," "members," and "agents" listed in § 1114 also qualify as "officials."

613 F.3d at 369–70 (footnote reference omitted).

We agree with the Third and Eighth Circuits that Anderson's interpretation would require an individual to be both an "official" and an "officer," "employee" or person assisting an officer or employee with their official duties under § 1114. *Id.*; *see also Wynn*, 827 F.3d at 785. Because Congress provided no guidance on how to even begin to determine which "officers," "employees," or persons assisting those officers or employees would count as "official[s]" under § 115, Anderson and the dissent's suggested interpretation is unworkable and unfaithful to the intent of the statute.

Our colleague in dissent reasons that an individual "assisting a federal officer or employee is not himself . . . a federal officer or employee." *Dissenting Opinion*, p. 26 (internal quotation marks omitted). But this reasoning elides the actual inclusion of those assisting a federal officer or employee under the umbrella of individuals referenced in §115, whose killing would violate § 1114. Admittedly, § 1114 did not originally protect persons assisting federal officers. *See Bankoff*, 613 F.3d at 368–69 (discussing amendment history of § 1114). But the dissent does not

explain how the subsequent expansion of § 1114 transformed the term "official" in § 115 into a term of limitation, when it was not a term of limitation originally. *See Dissenting Opinion*, p. 26–27 (agreeing that "federal employee[s]"—a class that encompasses the individuals previously protected by § 1114—are "'official[s]' within the meaning of § 115(a)(1)(B)").

The dissent also seeks to distinguish the cases relied on by the majority, both of which interpret the same two statutes at issue in this case. *See Dissenting Opinion* pp. 26–27. The dissent is correct that both *Bankoff* and *Wynn* involved federal employees, not persons assisting federal employees, but the *logic* of those cases does not support the dissent's proposed line-drawing. And it is telling that the dissent cites *no* case that has reached a different conclusion regarding the interplay between §§ 115 and 1114. Indeed, adoption of the dissent's reading of the statutes would create an unwarranted circuit split, a result we understandably avoid if at all possible. *See Padilla-Ramirez*, 882 F.3d at 836.

Anderson also contends that the legislative history of § 115 supports her reading that § 115 only applies to "officials" designated in § 1114. Actually, the legislative history of § 115 offers no such support. The Senate Report accompanying § 115 demonstrates, contrary to Anderson's position, that the protections afforded by § 115 were not intended to be limited to "officials." When § 115 was passed, the Senate wrote that:

> [§ 115] is a new provision designed to protect *the close relatives of* certain high level officials, such as the President, Vice-President, members of Congress, cabinet

> officers, and federal judges, as well as federal law enforcement officers . . .

> The Committee believes that serious crimes against family members of high level federal officials, federal judges, and federal law enforcement officers, which are committed because of their relatives' jobs are, generally speaking, proper matters of federal concern. . . .

S. Rep. No. 98-225 at 320 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3496, 1983 WL 25404 (emphasis added). This language signals that Congress' intent in passing § 115 was to afford protections to non-officials; we are therefore unpersuaded that § 115 should be read to capture only those "officials" listed in § 1114.

Anderson relies on the reference canon to argue that § 115 incorporates § 1114 as it existed in 1986, when Congress first added § 115(a)(1)(B). *See Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019) (explaining that, under the reference canon, "a statute that refers to another statute by . . . section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments") (citation omitted). At that time, § 1114 did not protect "person[s] assisting" federal employees and would not have protected PSOs like Bacchus. *See Bankoff*, 613 F.3d at 368 n.9.

But the reference canon does not apply when "there is some very clear indication to the contrary." *United States v. Smith*, 683 F.2d 1236, 1239 (9th Cir. 1982) (en banc) (citations omitted). And, as other circuits have concluded,

simultaneous amendment or re-enactment of both statutes "evidences a congressional intent to incorporate subsequent amendments." *United States v. Rodriguez-Rodriguez*, 863 F.2d 830, 831 (11th Cir. 1989) (per curiam). Even amendments that "appear small" can show that the interaction between two statutes "did not escape Congress's notice." *New York ex rel. N.Y. Off. of Child. & Fam. Servs. v. U.S. Dep't of Health & Hum. Servs.' Admin. for Child. & Fams.*, 556 F.3d 90, 99 (2d Cir. 2009).

Here, Congress amended both §§ 115 and 1114 when it passed the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub. L. No. 104-132, §§ 723, 727, 110 Stat 1214, 1300, 1302 (1996). It is implausible that Congress simultaneously edited both statutes but missed their interaction. True, AEDPA amended § 115(a)(1)(A), not subsection (a)(1)(B), with which Anderson is charged. But subsection (B) incorporates § 1114 only through its reference to subsection (A). Given the link between these subsections, it is absurd to think that Congress intended the scope of (a)(1)(A) (covering assaults, kidnappings, murders, attempts, and conspiracies) to differ from that of (a)(1)(B) (covering threats).

AEDPA's legislative history bolsters our conclusion that Congress was aware of the cross-reference and intended § 115 to incorporate the updates to § 1114. A summary of AEDPA explained that, "[b]y expanding the coverage of 18 U.S.C. 1114 to include all federal officers and employees, [AEDPA] also expands the coverage of . . . 18 U.S.C. 115." Charles Doyle, American Law Division, 96-499 A, Antiterrorism and Effective Death Penalty Act of 1996: A Summary 38 (1996) [hereinafter Doyle, Summary]. This reading also furthers AEDPA's "larger legislative scheme,"

*Rodriguez-Rodriguez*, 863 F.2d at 831, "[t]o deter terrorism." 110 Stat. at 1214.**[5]** We therefore reject application of the reference canon in this case as incompatible with Congressional intent.

We are convinced that affording the protections of § 115 to individuals who are threatened while assisting officers or employees of the United States with their official duties is similarly a "matter[] of federal concern." S. Rep. No. 98-225, at 320.

### III. Conclusion

Although we acknowledge that Congress could have more carefully drafted 18 U.S.C. § 115, we join our sister circuits in concluding that, plainly read, the statute incorporates all persons covered by 18 U.S.C. § 1114. When Anderson threatened PSO Bacchus, he was assisting the FPS in performing its official duty to protect the Social Security Office. Thus, her conduct violated 18 U.S.C. § 115, and the

---

**[5]** The events that prompted the passage of AEDPA included the deadly bombing at an Oklahoma City federal building in 1995. *See, e.g.*, Doyle, Summary, at 1 ("The Antiterrorism and Effective Death Penalty Act of 1996 is the product of legislative efforts . . . stimulated to passage in part by the traged[y] in Oklahoma City . . ."). Given this historical context, we cannot conclude that Congress intended to leave unprotected the very people who protect federal buildings: PSOs like Bacchus. *See also, e.g.*, Cara McCoy, *Slain Court Officer Remembered for Service to Las Vegas* (Jan. 11, 2010), https://lasvegassun.com/news/2010/jan/11/funeral-services-today-slain-court-officer/ (reporting on the killing of a court security officer in Las Vegas).

district court committed no error when it denied her Rule 29 motion for a judgment of acquittal.**[6]**

**AFFIRMED.**

W. FLETCHER, Circuit Judge, dissenting:

The majority writes that the statute under which Jacqueline Anderson was convicted "is not a model of legislative clarity," but concludes that the statute's "lack of clarity" does not protect Anderson from conviction. I respectfully disagree.

If the statute were truly unclear, it should not be used to convict Anderson. *Yates v. United States*, 574 U.S. 528, 547–48 (2015) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000))). However, with respect to the question before us, the statute is very clear. It does not support the conviction.

---

**[6]** We also reject Anderson's argument that a new trial is required because the district court mistakenly instructed the jury. The jury was instructed that "federal official" includes "any person assisting an officer or employee of the United States while such an officer or employee is engaged in the performance of official duties." As discussed, the instruction was a correct statement of law. Therefore, no new trial is required. *See United States v. Renzi*, 769 F.3d 731, 755–56 (9th Cir. 2014); *see also Wynn*, 827 F.3d at 785 (rejecting a claim of instructional error).

## I.  Background

The factual narrative underlying Anderson's conviction is accurately recounted in the majority opinion, and I will not repeat it here.

Anderson threatened Protective Security Officer ("PSO") Justin Bacchus outside of a Social Security Administration building.  PSOs assist the Federal Protective Service ("FPS"), a federal agency that protects government buildings.  Because FPS does not have enough officers to cover all of the buildings for which it is responsible, it contracts with Paragon Systems, a private security firm, to provide protection at some buildings.   Bacchus is an employee of Paragon Systems.

It is uncontested that Bacchus is not an employee of the federal government.  *See*, *e.g.*, *Rabieh v. United States*, No. 5:19-cv-00944, 2019 WL 5788673, at *2  (N.D. Cal. Nov. 6, 2019) (noting that PSOs "are Paragon employees," that "Paragon is responsible for most of the training of PSOs," and that "Paragon provides all management, supervision, equipment, and certification for PSOs"); *Gonzagowski v. United States*, 495 F. Supp. 3d 1048, 1103 (D.N.M. Sept. 1, 2020) ("[PSOs] are independent contractors and not federal employees . . . ."); *United States v. Maestas*, No. 18-2419, 2019 WL 145578, at *1 (D.N.M. Jan. 9, 2019) (concluding that a PSO is neither a federal employee nor a federal law enforcement officer).

Anderson was convicted of threatening an "official" within the meaning of 18 U.S.C. § 115. Section 115 provides, in relevant part,

> Whoever—threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or *an official whose killing would be a crime under [18 U.S.C. § 1114],* with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished as provided in subsection (b).

*Id.* § 115(a)(1)(B) (emphasis added). Section 1114, in turn, provides,

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or *any person assisting such an officer or employee in the performance of such duties* or on account of that assistance, shall be punished . . . .

*Id.* § 1114(a) (emphasis added).

## II.  Analysis

The majority and I agree that the question before us is whether Bacchus was "an official whose killing would be a crime under [18 U.S.C. § 1114]." *Id.* § 115(a)(1)(B).  The question is really two questions:  (1) Was Bacchus "an official"?  (2) Would his killing be a crime under § 1114?  In order to convict Anderson, the answer to both questions must have been "yes."  The answer to the first question is "no."

The Supreme Court has "stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."  *Barnhart v. Sigmon Coal Co.*, *Inc.*, 534 U.S. 438, 461–62 (2002) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).  "[A] literal reading of Congress' words is generally the only proper reading of those words."  *United States v. Locke*, 471 U.S. 84, 93 (1985).

Section 115(a)(1)(B) criminalizes threats against "an official whose killing would be a crime under [18 U.S.C. § 1114]."   It is undisputed that an "official" under § 115(a)(1)(B) refers to a federal official.  The restrictive relative clause "whose killing would be a crime under [18 U.S.C. § 1114]" limits the category of federal officials to which § 115(a)(1)(B) applies.  *See* The Chicago Manual of Style ¶ 6.27 (17th ed. 2017) ("A clause is said to be restrictive (or defining) if it provides information that is essential to understanding the intended meaning of the rest of the sentence.   Restrictive relative clauses are usually introduced by *that* (or by *who/whom/whose*) and are never set off by commas from the rest of the sentence."); *see also*

*United States v. Nishiie*, 996 F.3d 1013, 1017 (9th Cir. 2021) (noting that restrictive relative clauses are "limiting"). The restrictive clause thus indicates that the target of the threat must not only be a federal official, but must also be a federal official whose killing would be a crime under § 1114. Put differently, § 115(a)(1)(B) protects federal officials, but only the subset of federal officials whose killing would be a crime under § 1114.

Section 1114 criminalizes killing an "officer," "employee," and "any person assisting such an officer or employee." A person "assisting" a federal officer or employee is not himself or herself a federal officer or employee. Rather, as § 1114 plainly states, that person is *assisting* an officer or employee. Under a reasonable reading of § 1114, Bacchus was assisting an officer or employee of the United States in providing private security to a Social Security Administration building. But under no reasonable reading was he, by virtue of providing such assistance, himself an officer or employee.

Anderson was convicted under § 115(a)(1)(B) of threatening a federal official. Bacchus, the target of Anderson's threat, was not a federal official. Rather, he was a "person assisting . . . an officer or employee" of the United States. Under the plain meaning of the statute, Anderson did not violate § 115(a)(1)(B). That should be the end of the matter.

### III.  Majority Opinion

My colleagues disagree. They read "official" in § 115(a)(1)(B) to include everyone protected in § 1114, not limited to the federal "officials" who are protected in § 1114.

They rely heavily on two cases to support their reading. Neither case provides support.

The first is *United States v. Bankoff*, 613 F.3d 358 (3d Cir. 2010).  The question in *Bankoff* was whether an "employee" of the federal government, as that term is used in § 1114, is an "official," as that term is used in § 115(a)(1)(B). The Third Circuit answered "yes":

> In sum, we conclude that when § 115's reference to an "official whose killing would be a crime under" § 1114 is read in context, its meaning is plain; "official" is not used as a term of limitation, but as a general term that incorporates by reference all the individuals protected under § 1114, both "officer[s] and employee[s]."

*Id.* at 370.  The second case is *United States v. Wynn*, 827 F.3d 778 (8th Cir. 2016).  The question in *Wynn* was the same as in *Bankoff*:  Is a federal "employee," as used in § 1114, an "official," as used in § 115(a)(1)(B)?  The Eighth Circuit followed *Bankoff*.  It wrote, "Though the interpretive question is not free from doubt, we agree with the Third Circuit's analysis." *Id.* at 784.

If the question presented in *Bankoff* and *Wynn* were before us, I would reach the same answer as the Third and Eighth Circuits.  But those courts answered a different question.  The question in *Bankoff* and *Wynn* was whether a federal "employee" is a federal "official" within the meaning of § 115(a)(1)(B).

The question before us is whether a private employee who *assists* a federal officer or employee is a federal "official" within the meaning of § 115(a)(1)(B).  The answer is straightforward.  Bacchus was assisting federal officers or employees.  He did not, by virtue of his assistance, *become* a federal officer or employee.

## Conclusion

Section 115(a)(1)(B) does not criminalize a threat against an employee of a private corporation that has contracted with the government to provide security to a government building.  Perhaps such a threat should be made criminal under federal law.  But that is a task for Congress, not for us.

I respectfully dissent.